## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

THE ESTATE OF JESSIE MILLER,
by Robert Bertram, Special Administrator,

      and

WESLEY JAMES STEWART (A Minor) and NAKITA
MARIE FALKENSTEIN (A Minor)

          Plaintiffs,

  v.

THOMAS MICHLOWSKI MD, MPH; RYAN TOBIASZ,
PSY.D; SALLY FARLEY; DR. CARLO GANAAN;
TERALYN SELL; JENNIFER DE GROOT; BARBARA
WAEDEKIN, M.D.; LIEUTENANT BOODRY; CAPTAIN
M. JOHNSON; SEARGEANT SEVERSON; OFFICER
MILLARD; OFFICER HERBRAND; OFFICER BATH;
OFFICER QUADE; PAUL PERSSON, R.N.; WARDEN
GREGORY D. GRAMS; DEPUTY WARDEN, MARC C.
CLEMENTS; JANEL M. NICKEL; LORI E. ALSUM;
MARTHA BREEN-SMITH; STEPHEN J. NOVACHECK,
M.D.; BRYAN BARTOW; RICK RAEMISCH; KEVIN
KALLAS, M.D.; DONALD R. HANDS, PH.D; KAREN
TIMBERLAKE; JANE DOE, R.N.; JOHN DOE.

          Defendants.

Case No. 10-CV-807

---

## COMPLAINT

---

NOW COMES the above named plaintiffs, by their attorneys, GENDE LAW OFFICE, S.C., and as for their claims for relief against the above named defendants, allege and show the Court as follows:

### I.    INTRODUCTION

1.    This case involves the State of Wisconsin, the State of Wisconsin Department of Corrections ("WDOC"), the Wisconsin Department of Health Services ("WDHS"), and the named

defendants' methods of infringing on and violating the Constitutional, civil, and statutory rights of Jessie Miller ("Miller"), which was a substantial cause of his death. Miller was subjected to care, which is incompatible with the evolving standards of decency that mark the progress of a maturing society and which involved the wanton and unnecessary infliction of pain, suffering, embarrassment and death. Miller, a male, formerly housed at Columbia Correctional Institute ("CCI") committed suicide shortly after being transferred from the Wisconsin Resource Center ("WRC"); despite the fact CCI, and the individually named defendants, recognized Miller as an inmate with serious mental illnesses and a substantial suicide risk. Miller was transferred to CCI from WRC on June 19, 2009, where it was recorded that "Clinical course has been very problematic with significant self abuse (eg) head banging – ramming head into wall etc." (Exhibit 1)(emphasis in original) When Miller arrived at CCI, Defendant Tobiasz recorded, "Mr. Miller's diagnoses are deferred at this time as a review of the file has not been completed. . . . Mr. Miller will be routinely monitored by psychological services while housed on HU7." (Exhibit 2) Tragically, and despite Miller's confirmed serious self-harming and suicidal tendencies, he was not seen by any health care provider from the time of his intake on June 19, 2009, until the time of his death on June 23, 2009. Instead Miller was placed in a cell with no suicide precautions or 15 minute checks by staff. Miller was given access to materials to hang himself and subsequently took his own life.

2.      As a result of a request by the WDHS, and defendants Michlowski, Degroot, and Waedekin, on February 24, 2009, the Honorable Bruce Schmidt issued an order adjudicating Miller incompetent and requiring Miller to be medicated and treated due to "mental illness." Miller was not competent to refuse psychotropic medications because he was "incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives" and Miller was "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his condition in order to make an informed choice as whether to

accept or refuse psychotropic medications" (Exhibit 3) The Court also found that there were grounds for commitment because Miller was mentally ill and therefore committed him to the care and custody of the WDHS. (Exhibit 4)   Despite these court orders, during the days immediately preceding Miller's death, some of the defendants failed to administer court ordered medication in violation of their ministerial duty, and subsequently failed to properly record and/or notify the appropriate parties of Miller's medication regimen and/or refusals, in addition to failing to provide any sort of mental health care to Miller, an individual with known suicidal tendencies in the days, weeks, months and years preceding his death.

3.     Plaintiffs bring this action pursuant to Wis. Stats. §§ 895.01 and 895.03; Title 42 of the United States Code, Sections 1983 & 1985 for violations of Miller's Eighth and Fourteenth Amendment rights under the United States Constitution.

## II.   JURISDICTION

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because this action arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. §1343(a)(3) because this action seeks to redress the deprivation, under color of state law, of the decedent's, Miller's, civil rights.

## III.   VENUE

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because many defendants reside in this district and because a substantial part of the events and omissions giving rise to the plaintiffs' claims occurred in the district.

## IV.   THE PARTIES

6.     The special administrator for the Estate of Jessie Miller represents the decedent Jessie "Miller," who committed suicide while in the custody of WDHS and WDOC at CCI, located at 2925 Columbia Drive, Portage, WI 53901, on June 23, 2009.

7.     The administrator of Miller's estate is Robert Bertram a Wisconsin Attorney, with standing to bring this action on behalf of the Estate of Jessie Miller pursuant to Wisconsin Statute and by order of the Circuit Court for Dane County, Case No. 10 PR 758.

8.     Plaintiff, Wesley James Stewart, is the minor brother of Miller and is a citizen of the United States and a resident of the State of Wisconsin.

9.     Plaintiff, Nakita Marie Falkenstein, is the minor sister of Miller and is a citizen of the United States and a resident of the State of Wisconsin.

10.    Defendant, Thomas Michlowski MD, MPH ("Michlowski"), is an adult citizen of the United States and a resident of the State of Wisconsin, who was Miller's primary care physician/psychiatrist at WRC, who exhibited deliberate indifference by failing to provide necessary medical assistance to Miller before he left WRC and failing to assure that proper care and treatment would be provided to Miller upon his arrival at CCI, despite Miller's acute suicidal state and many previous suicide and self-harm attempts.

11.    Defendant Ryan Tobiasz, Psy.D, Psychological Associate, is an adult citizen of the United States and a resident of the State of Wisconsin, who on June 19, 2009, and thereafter, failed to properly assess Miller or review his clinical past and therefore placed Miller on a unit where he had an unobstructed opportunity to take his own life.  Tobiasz was aware of Miller's propensity for self-harm and for attempts at suicide, yet exhibited deliberate indifference by failing to assure proper placement and monitoring of Miller.

12.    Defendant Sally Farley, Social Worker is an adult citizen of the United States and a resident of the State of Wisconsin, who was aware of Miller's acute suicidal state, yet exhibited deliberate indifference by allowing Miller to be transported to CCI and placed in a custodial environment bereft of suicide precautions and/or monitoring.

4

13.     Defendant Dr. Carlo Gaanan, is an adult citizen of the United States and a resident of the State of Wisconsin, who was Miller's medical doctor at WRC, who was aware of Miller's acute suicidal state, as well as his history of self-harm and suicide attempts, yet exhibited deliberate indifference by allowing Miller to be transferred to CCI and placed in a custodial environment bereft of suicide precautions and/or monitoring and failing to assure that proper care and treatment would be provided to Miller upon his arrival at CCI.

14.     Defendant, Teralyn Sell, Psychological Associate, is an adult citizen of the Untied States and a resident of the State of Wisconsin, who was Miller's psychologist at WRC, who exhibited deliberate indifference by failing to provide necessary medical and mental health assistance to Miller before he left WRC and failing to assure that proper care and treatment would be provided to Miller upon his arrival at CCI, despite Miller's acute suicidal state and many previous suicide and self-harm attempts.

15.     Defendant Jennifer De Groot, Psychological Associate, is an adult citizen of the United States and a resident of the State of Wisconsin, who was Miller's psychologist at WRC and successfully petitioned the Winnebago County Court to have Miller found mentally ill, dangerous to himself, and to a reasonable degree of medical certainty would benefit from involuntary medication, yet exhibited deliberate indifference by failing to provide the necessary medical assistance to Miller before he left WRC and failing to assure that proper care and treatment would be provided to Miller upon his arrival at CCI, despite Miller's acute and habitual suicide and self-harm attempts.

16.     Defendant, Barbara Waedekin, M.D. ("Waedekin"), is an adult citizen of the United States and a resident of the State of Wisconsin, who was Miller's primary care psychiatrist at WRC, who successfully petitioned the Winnebago County Court to have Miller found mentally ill, dangerous to himself, and to a reasonable degree of medical certainty would benefit from involuntary medication, yet exhibited deliberate indifference by failing to provide necessary medical

assistance to Miller before he left WRC and failing to assure that proper care and treatment would be provided to Miller upon his arrival at CCI, despite Miller's acute and habitual suicidal and self harm attempts.

17.     Defendant Lieutenant Boodry, is an adult citizen of the United States and a resident of the State of Wisconsin, who on the evening of June 22, 2009, failed to assure the safety of Miller, despite: Miller's adjudication of being mentally ill; Miller's court ordered medications; and Miller's numerous suicide attempts and well-documented history of suicide attempts.

18.     Defendant Captain M. Johnson, is an adult citizen of the United States and a resident of the State of Wisconsin, who on the evening of June 22, 2009, failed to assure the safety of Miller, despite: Miller's adjudication of being mentally ill; Miller's court ordered medications; and Miller's numerous suicide attempts and well-documented history of suicide attempts.

19.     Defendant Sergeant Severson, is an adult citizen of the United States and a resident of the State of Wisconsin, who on the evening of June 22, 2009, failed to assure the safety of Miller, despite: Miller's adjudication of being mentally ill; Miller's court ordered medications; and Miller's numerous suicide attempts and well-documented history of suicide attempts.

20.     Defendant Officer Millard, is an adult citizen of the United States and a resident of the State of Wisconsin, who on the evening of June 22, 2009, failed to assure the safety of Miller, despite: Miller's adjudication of being mentally ill; Miller's court ordered medications; and Miller's numerous suicide attempts and well-documented history of suicide attempts.

21.     Defendant Officer Herbrand, is an adult citizen of the United States and a resident of the State of Wisconsin, who on the evening of June 22, 2009, failed to assure the safety of Miller, despite: Miller's adjudication of being mentally ill; Miller's court ordered medications; and Miller's numerous suicide attempts and well-documented history of suicide attempts.

Case: 3:10-cv-00807-wmc   Document #: 1   Filed: 12/17/10   Page 7 of 32

22      Defendant Officer Bath, is an adult citizen of the United States and a resident of the State of Wisconsin, who on the evening of June 22, 2009, failed to assure the safety of Miller, despite: Miller's adjudication of being mentally ill; Miller's court ordered medications; and Miller's numerous suicide attempts and well-documented history of suicide attempts.

23.      Defendant Officer Quade, is an adult citizen of the United States and a resident of the State of Wisconsin, who on the evening of June 22, 2009, failed to assure the safety of Miller, despite: Miller's adjudication of being mentally ill; Miller's court ordered medications; and Miller's numerous suicide attempts and well-documented history of suicide attempts.

24.      Defendant R.N. Paul Persson, is an adult citizen of the United States and a resident of the State of Wisconsin, who on the evening of June 22, 2009, failed to assure the safety of Miller, and failed to provide medical assistance to Miller, despite: Miller's adjudication of being mentally ill; Miller's court ordered medications; and Miller's numerous suicide attempts and well-documented history of suicide attempts.

25.      Defendant Warden Gregory D. Grams, is an adult citizen of the United States and a resident of the State of Wisconsin, and at all times material hereto, was the Warden at CCI, and as such, was the legal custodian of all inmates housed at CCI, and was responsible for the safe, secure and humane housing of those inmates, including Miller.  In addition to the daily administration and functioning of CCI, Defendant Grams supervised and had direct control over the management of the CCI Health Services Unit and CCI psychological service staff, including psychologist, crisis intervention workers, social workers and professional counselors who were responsible for the care and treatment of Miller's severe mental health illness.

26.      Defendant Deputy Warden, Marc C. Clements, is an adult citizen of the United States and a resident of the State of Wisconsin, and at all times material hereto was the Deputy

7

Warden at CCI, and as such, was responsible for assuring that CCI was a safe, secure, and humane environment for all inmates, including Miller.

27.     Defendant Segregation Complex Manager/Security Director Janel M. Nickel, is an adult citizen of the United States and a resident of the State of Wisconsin, who at all times material hereto was the Segregation Complex Manager/Security Director at CCI, and as such, was responsible for assuring that CCI, and the Segregation Complex were a safe, secure, and humane environment for all inmates, including Miller.

28.     Defendant Health Services Supervisor, Lori E. Alsum, is an adult citizen of the United States and a resident of the State of Wisconsin, who at all times material hereto, was the Health Services Supervisor, and as such, was responsible for the daily administration and proper functioning of Health Services at CCI.  Alsum supervised and had direct authority over all nursing professionals at CCI, yet exhibited deliberate indifference by failing to assure the safety of Miller, and failing to assure that Miller received his medications, despite Miller's numerous suicide attempts and well-documented history of suicide attempts.

29.     Defendant Psychological Services Manager, Martha Breen-Smith, is an adult citizen of the United States and a resident of the State of Wisconsin, who at all times material hereto was the Psychological Services Manager at CCI, and as such, was responsible for the daily administration of mental health care services to individuals at CCI, including Miller, yet exhibited deliberate indifference by failing to assure Miller was properly assessed and received mental health services prior to his death, despite Miller's numerous suicide attempts and well-documented history of suicide attempts.

30.     Defendant Medical Director, Stephen J. Novacheck, M.D., is an adult citizen of the United States and a resident of the State of Wisconsin, who at all times material hereto was the Medical Director at CCI, and as such, was responsible for the provision of medical services to

individuals incarcerated at CCI, including Miller, and he was responsible for the quality and adequacy of medical services provided to those incarcerated at CCI, including Miller, yet exhibited deliberate indifference by failing to provide any medical care, mental health or otherwise, to Miller during his time at CCI, despite Miller's numerous suicide attempts and well-documented history of suicide attempts.

31.     Defendant Institution Director, Bryan Bartow, is an adult citizen of the United States and a resident of the State of Wisconsin, who at all times relevant hereto, was the Director of the WRC and as such, was responsible for the safe, secure and humane treatment of WRC patients, including Miller. In addition to the daily administration and functioning of WRC, Defendant Bartow also oversaw, supervised and had direct control over the management and operations of the WRC health services including medical staff, nursing staff, psychological staff, social workers and professional counselors who were responsible for the humane care and treatment of Miller. Bartow had participated in Miller's treatment and was aware of Miller's severe mental health issues and suicidal actions prior to Miller's transfer, yet exhibited deliberate indifference by failing to assure that proper treatment was provided to Miller at WRC and failing to assure proper care and treatment would be provided to Miller upon his arrival at CCI, despite Miller's acute suicidal state and many previous suicide and self-harm attempts.

32.     Defendant, Rick Raemisch, is an adult citizen of the Untied States and a resident of the State of Wisconsin, who at all times material hereto, was the Secretary of the WDOC. As such, he was the legal custodian of all inmates sentenced by the courts of Wisconsin for felony offenses, and was responsible for the safe, secure and humane housing of those inmates, including Miller. Raemisch was responsible for administration and operation of the WDOC, as well as the adequate provision of medical and mental health care to all Wisconsin inmates, including Miller.

9

33.     Defendant, Kevin Kallas, M.D., is an adult citizen of the United States and a resident of the State of Wisconsin, who at all times material hereto, was the Mental Health Director at the WDOC. As such, he was responsible for the administration and provision of mental health services to individuals in WDOC custody, including Miller, and for the quality and adequacy of those services. Kallas supervised and had direct authority over all psychiatrists who worked at CCI, and provided technical assistance to the CCI warden in supervising the prison's psychological staff. Kallas was directly involved in Jesse Miller's care.

34.     Defendant, Donald R. Hands, Ph.D., is an adult citizen of the United States and is a resident of the State of Wisconsin and, at all times material hereto, was the Psychology Director at the WDOC. As such, he was responsible for the administration and provision of mental health care services to individuals in WDOC custody, including Miller, and for the quality and adequacy of those services. Hands assisted in the supervision of all psychologists who worked at CCI, and provided technical assistance to the CCI warden in supervising the prison's psychological staff charged with the responsibility of caring for Miller's severe mental health illnesses.

35.     Defendant, Karen Timberlake, is an adult citizen of the United States and is a resident of the state of Wisconsin and, at all times material hereto, was the Secretary of WDHS. As such, she was the legal custodian of all inmates entrusted to the care and custody of WDHS, and was responsible for the safe, secure and humane housing of those patients/inmates, including Miller. Timberlake was responsible for the administration and operation of WDHS, including the adequate provision of medical and mental health care to all inmates in the department's custody, including Miller.

36      Defendant Jane Doe, R.N., upon information and belief is an adult citizen of the United States and a resident of the State of Wisconsin, who completed Miller's transfer screening on June 19, 2009, yet exhibited deliberate indifference by failing to assure that Miller's needs were met,

failing to assure Miller's severe mental disease and suicidal ideations were addressed, and or failing to prevent Miller from being placed in a cell which did not provide suicide monitoring by staff. Jane Doe sings her signature as follows: (See Exhibit 5).

PRINT NURSE'S NAME
Jennifer A. Dcue

37.    Defendant John Doe, upon information and belief is an adult citizen of the United States and a resident of the State of Wisconsin, who reviewed Miller's chart upon Miller's arrival at CCI on June 19, 2009, yet exhibited deliberate indifference by failing to assure Miller's needs were met, failing to assure Miller's severe mental disease and suicidal ideations were addressed, and or failing to prevent Miller from being placed in a cell which did not provide suicide monitoring by staff. Joe Doe signs his signature as follows: (See Exhibit 1)

6/19/09    Pt chart reviewed upon arrival.

38.    All of the defendants are sued in their individual and official capacities. At all relevant times, these defendants were acting under the color of state law; pursuant to their authority as officials, agents, contractors or employees of the State of Wisconsin; within the scope of their employment as representatives of public entities, as defined in 42 U.S.C. §12131(1), and were deliberately indifferent to the Constitutional, civil, and statutory rights of Miller.

## V.    FACTS

39.    Plaintiffs reallege and incorporate herein by reference the allegations of the preceding paragraphs.

40. That on November 10, 2007, Miller attempted suicide while in the Dane County Jail and on November 12, 2007, was transferred to Mendota Health Institute on an emergency detention. (Exhibit 6)

41. That upon arrival at Dodge Correctional Institute, June 4, 2008, it was recorded that Miller suffered from ADHD, Bipolar Disorder, Depression, and a history of cutting himself. (Exhibit 7)

42. The defendants knew or should have known prior to Miller's death that on June 4, 2008, pursuant to a Mental Health Screening Interview that Miller had a "history of recurrent suicidality," had attempted to kill himself on several occasions, had been thinking about hurting or killing himself recently, had been on suicide watch in County Jail, and was seeing and hearing voices and visions. (Exhibit 8)

43. The defendants knew or should have known prior to Miller's death that on June 5, 2008, that he had been was placed into restraints because he was hearing voices telling him to harm himself. (Exhibit 9)

44. The defendants knew or should have known prior to Miller's death that on June 5, 2008, a DCI psychologist confirmed Miller suffered from, "… self injurious behaviors. He has poor impulse control and is very frightened of Unit 18. It seems most prudent to have him go to observation voluntarily. Also, given his history of self-harm [and] harm to other even mild risk must be taken very seriously." (Exhibit 9)

45. The defendants knew or should have known prior to Miller's death that on June 14, 2008, Miller had attempted self harm by cutting his wrists. (Exhibit 10)

46. The defendants knew or should have known prior to Miller's death that on June 15, 2008, Miller had tied a sheet tightly around his neck and lost consciousness for two or three

minutes– he had to be rushed to the hospital.  Miller stated that he was attempting to kill himself. (Exhibit 11)(Exhibit 12)

47.      The defendants knew or should have known prior to Miller's death that on June 15, 2008, while Miller was at Waupun Memorial Hospital he was given a suicide assessment.  Miller confirmed that he had a plan for suicide and intended to act on said plan.  (Exhibit 12)

48.      The defendants knew or should have known prior to Miller's death that on June 15, 2008, Michelle Harris, PhD recorded, "[Miller] was on SMU when he tied a sheet around his neck and attempted to strangle himself.  Suicide attempt was serious and [Miller] experienced [loss of consciousness].  There was a concern about a neck injury and [inmate] was sent to the hospital and placed on [observation] upon return."  (Exhibit 13)

49.      The defendants knew or should have known prior to Miller's death that on June 16, 2008, Miller was reviewed for Mental Health placement at which time he confirmed that he had two recent suicide attempts which resulted in loss of conciseness – it was recommended that Miller be placed at WRC, that it was a priority transfer, and the urgency of the referral was a ten out of ten. (Exhibit 14)

50.      The defendants knew or should have known prior to Miller's death that on June 16, 2008, Mary Lynn Stock, Ph.D, opined that Miller **Must Be** on Psychiatric medications.  (Exhibit 15)

51.      The defendants knew or should have known prior to Miller's death that on June 17, 2008, Dr. James Rohan recorded, "[Miller] came to this facility on 06/04/08 after more than 1 year of incarceration at the Dane County Jail, including four separate hospitalizations at Mendota Mental Health Institute and other psychiatric hospitals for parasuicidal behavior. . . . On 6/04/08 he choked himself with a sheet at the jail and was taken to the emergency room . . . At the age of 16 he jumped from the top of a three story building . . . He has engaged in many self-harm behaviors while in jail, including cutting his arms and jumping off his sink head first.  At the Dane County Jail, he was from

time to time required to wear a helmet and was required to be strapped into a special chair when his behavior could not be otherwise controlled. . . . He continued to bite at his wrists while under observation status on 06/15/08, even after being ordered by officers to stop. He was then placed in restraints. After being placed in restraints he began to bang his head on the mattress and pull up at his restraints. . . . He told the psychologist he did not want to harm himself, but the voices were telling him to do so. . . . he has attempted at least parasuicidal behaviors many times in the past. These tend to be done impulsively, with very short notice. Perceptual disturbances were described as chronic voices that are almost always present and disturbing and which suggest self harm. (Exhibit 16)

52.    The defendants knew or should have known prior to Miller's death that on June 18, 2008, Dr. Jason Kocina, Ph.D identified Miller as a "high suicide risk," and opined Miller "Must be on Psychiatric Medications." (Exhibit 17)

53.    The defendants knew or should have known prior to Miller's death that "Miller arrived at WRC on 06/19/08 from DCI for evaluation and assessment of the inmate's clinical placement needs. He made a serious suicide attempt on 06/07/08 (strangulation with a ligature). . . . They had to struggle to cut it with the 911 knife because it was tied so tight. When he returned from the hospital and was placed in OBS, he cut his wrist with his fingernail and then began biting and gnawing on his arm and went into restraints. Referral made due to the severity of his suicide attempt . . . . " (Exhibit 18)

54.    The defendants knew or should have known prior to Miller's death that when Miller arrived at WRC it was confirmed Miller suffered from mental health issues since the age of 5. (Exhibit 16)

55.   The defendants knew or should have known prior to Miller's death that on June 19, 2008, during his initial entrance screening to WRC it was confirmed that he recently undertook the, "Most severe attempt at suicide – tied sheet around neck three days ago." (Exhibit 19).

56.   The defendants knew or should have known prior to Miller's death that on June 19, 2008, during Miller's initial assessment with Defendant Michlowski it was confirmed that Miller recently attempted suicide at the Dodge facility – where he tried to hang himself with a sheet. (Exhibit 20)

57.   The defendants knew or should have known prior to Miller's death that on June 29, 2008, it was confirmed Miller swallowed some metal and razor blades in an attempt to harm himself. (Exhibit 21)

58.   The defendants knew or should have known prior to Miller's death that on July 8, 2008, Miller underwent an admission screening at WRC and it was confirmed, "[Miller] was hospitalized psychiatrically at Mendota Mental Health Institute, Winnebago Mental Health Institute, and Meriter Hospital (Madison).  In addition, he was placed on the Dodge Correctional Institution Special Management Unit, which is a unit designed for inmates conceptualized as suffering mental health issues or being vulnerable.  He also received services as a juvenile in residential treatment centers.  *Mr. Miller engaged in multiple self-harm behaviors, including cutting and strangulating himself during separate incidents.  Mental health professionals described Mr. Miller as suffering various clinical issues that impair his functioning.  Clinical records revealed he confirmed hallucinations that tell him, 'Kill yourself,' 'The aliens are going to get you,' and other derogatory statements about him and his family.*" (Exhibit 22)

59.   The defendants knew or should have known prior to Miller's death that on August 19, 2008, Miller's treatment team met and confirmed Miller had been, "Referred from DCI for the

purpose of evaluation and stabilization *after a serious suicide attempt and other self harm behaviors.*" (Exhibit 23)

60.     The defendants knew or should have known prior to Miller's death that on October 14, 2008, Defendant Sell confirmed, "Mr. Miller reports thoughts of suicide on a daily basis. *Due to his past suicidal behavior he may be at a heightened risk for suicide and should therefore be monitored closely.*" (Exhibit 24)

61.     The defendants knew or should have known prior to Miller's death that on October 20, 2008, Defendant Sell confirmed, "*Mr. Miller reports thoughts of suicide on a daily basis. Due to his past suicidal behavior he may be at a heightened risk for suicide and should therefore be monitored closely.*" (Exhibit 25)

62.     The defendants knew or should have known prior to Miller's death that on November 24, 2008, Defendant Sell recorded, "*Mr. Miller reports thoughts of suicide on a daily basis. Due to his past suicidal behavior he may be a heightened risk for suicide and should therefore be monitored closely.*" (Exhibit 26)

63.     The defendants knew or should have known prior to Miller's death that on December 2, 2008, Defendant Sell confirmed, "*Mr. Miller has reported thoughts of suicide on a frequent basis. Due to his past suicidal behavior he may be at a heightened risk for suicide and should therefore continue to be monitored closely.*" (Exhibit 27)

64.     The defendants knew or should have known prior to Miller's death that on December 15, 2008, Defendant Sell confirmed, "Mr. Miller was seen while in observation. He reports, 'I beat myself up.' Mr. Miller had scratches on his arms and face. In addition he had a large lump in the middle of his forehead from head banging . . . *Mr. Miller has reported thoughts of suicide on a frequent basis. He did not elaborate on suicidal thoughts today, however, due*

*to his past suicidal behavior he may be at a heightened risk for suicide and should therefore continue to be monitored closely.*" (Exhibit 28)

65.    The defendants knew or should have known prior to Miller's death that a psychological assessment report dated December 17, 2008, confirmed "*Mr. Miller was admitted to WRC for the first time on 06/19/08 after he attempted suicide by hanging himself in his cell at DCI . . . [Miller] admitted to attempting suicide eight different times, with the most recent being in June of 2008 when he attempted to hang himself in his cell.* Reports indicated this attempt was significant in that he lost consciousness. Mr. Miller stated that he began seeing things at age 10 and hearing voices at age 14. He confirmed that he has seen shadows, spiders, and objects hanging for (sic) the ceiling. He also confirmed hearing voices that tell him to hurt himself, put him down, and command him to do things." (Exhibit 29)

66.    The defendants knew or should have known prior to Miller's death that on December 23, 2008, Defendant Sell confirmed, "*Mr. Miller has reported thoughts of suicide on a frequent basis. He did not elaborate on suicidal thoughts today, however due to his past suicidal behavior he may be at a heightened risk for suicide and should therefore continue to be monitored closely.*" (Exhibit 30)

67.    The defendants knew or should have known prior to Miller's death that on January 19, 2009, Miller told peers that he was going to kill himself. (Exhibit 31)

68.    The defendants knew or should have known prior to Miller's death that on January 20, 2009, Miller told staff that he wanted to "die." (Exhibit 31)

69.    The defendants knew or should have known prior to Miller's death that on January 19, 2009, Miller was placed into observation because, "*Mr. Miller's roommate reported that he had a sheet and a plastic bag prepared to kill himself. These items were found by staff. During the move to observation Mr. Miller became resistive staff and was attempting to*

17

*smash his head against the wall. Mr. Miller reported to [Defendant Degroot] that he would kill himself 'somehow, his way.'"* Defendant Degroot confirmed, "Mr. Miller continues to state that he will kill himself. He said that he will bang his head against the wall and will not eat or drink. Mr. Miller is currently a danger to self." (Exhibit 32)

70.     The defendants knew or should have known prior to Miller's death that on January 19, 2009, Miller was placed in restraints because he wanted to put a bag over his head and was making statements about breaking his neck and killing himself. (Exhibit 33)

71.     The defendants knew or should have known prior to Miller's death that on January 20, 2009, Miller underwent a CT scan of his head, his C-spine, and his L-spine as a result of smashing his head into the wall and loosing consciousness. (Exhibit 34)

72.     The defendants knew or should have known prior to Miller's death that on January 21, 2009, Miller had to be placed in restraints because he was attempting self harm. (Exhibit 35)

73.     The defendants knew or should have known prior to Miller's death that on January 22, 2009, Miller intentionally ran across his cell and rammed the top of his head into the cell door in an attempt to harm himself. (Exhibit 36)

74.     The defendants knew or should have known prior to Miller's death that on January 22, 2009, Miller continued to bang his head while in restraints and had to be placed in a helmet. (Exhibit 36)

75.     The defendants knew or should have known prior to Miller's death that on January 22, 2009, Defendant Sell confirmed, "This note is reflective of several interactions with Mr. Miller while he was in Observation and Restrain status. *Mr. Miller was placed in Observation status after giving away his property on the unit and telling staff of suicidal ideation. Upon placement in Observation Mr. Miller began ramming his head into the walls, stopped eating and drinking (4 days) and refused regular medication. Mr. Miller was then placed in*

18

restraints and began a cycle of observation, head banging and restrain placement spanning several days." (Exhibit 37).

76.     The defendants knew or should have known prior to Miller's death that on January 23, 2009, Miller's chart confirmed, "There are significant Axis II issues here in addition to his confirmed psychiatric symptoms.  Taking everything into consideration it would be helpful to have a court commitment in place so that we can treat him appropriately."  (Exhibit 38)

77.     The defendants knew or should have known prior to Miller's death that on January 23, 2009, defendants De Groot, Waedekin, and Michlowski petitioned the Winnebago County courts to examine the condition of Miller because, "*Mr. Miller continues to state that he wants to kill himself.  In an incident on 01/21/09, Mr. Miller rammed his head into his cell door and fell to the floor.  In another incident he struggled with staff and was placed in full bed restraints after he was threatening to bang his head.  On 01/22/09, Mr. Miller punched cell door and banged his head against the door.*"  (Exhibit 39)

78.     The defendants knew or should have known prior to Miller's death that on January 23, 2009, Defendant Michlowski confirmed, "The purpose of this letter is to request that we petition the court to find *that Mr. Jesse Miller is mentally ill, dangerous to himself . . . Mr. Miller is presently delusional, in so far as, he believes that God is communicating with him and that God does not want him to take medication, 'so that I can die.'* He further states that a certain individual at a previous facility was sent by God to communicate this information to him.  As regards to dangerousness, Mr. Miller has on several occasions rammed his head into the wall in his room and states that he will continue to do so until he is dead.  In conclusion, *it is my opinion to a reasonable degree of medical psychiatric certainty that Mr. Miller is at this time suffering from a major mental illness to a psychotic degree and, for the reasons given above, should be considered dangerous to himself.*"  (Exhibit 40)

79.    The defendants knew or should have known prior to Miller's death that on January 23, 2009, it was confirmed that, *"[Miller] continues to engage in serious self-abuse behavior and verbalize suicidal intent.  Mr. Miller has had to be taken to the hospital on numerous occasions after banging his head so hard he lost consciousness."* (Exhibit 41)

80.    The defendants knew or should have known prior to Miller's death that on January 23, 2009, Miller was sent to Mercy Medical Center to have x-rays of his cervical spine and skull as a result of self-harming activities. (Exhibit 42)

81.    The defendants knew or should have known prior to Miller's death that after Miller returned from Mercy Medical Center on January 23, 2009, Michelle O' Neil required Miller be placed, "... in full bed restraints [upon] any head banging or verbalizations of this.  An Assessment by POC and AOC must be conducted prior to release from restraints." (Exhibit 43)

82.    The defendants knew or should have known prior to Miller's death that on January 6, 2009, Defendant Sell confirmed, *"Mr. Miller has reported thoughts of suicide and self harm on a frequent basis.  He did not elaborate on suicidal thoughts today, however, due to his past suicidal behavior he may be at a heightened risk for suicide and self harm and should therefore continue to be monitored closely."* (Exhibit 44)

83.    The defendants knew or should have known prior to Miller's death that on January 28, 2009, it was confirmed, "Mr. Miller presented in session with two black eyes and forehead bruising.  This was in result of the extensive head banging that he did while in observation status." (Exhibit 45)

84.    The defendants knew or should have known prior to Miller's death that on January 28, 2009, Defendant Sell confirmed, *"[Miller] was threatening/bargaining suicide and self harm if returned to the DOC."* (Exhibit 45)

85.     The defendants knew or should have known prior to Miller's death that on January 30, 2009, Miller wanted to speak with someone as soon as possible because he was seeing people in his cell and had not slept for two days. (Exhibit 46)

86.     The defendants knew or should have known prior to Miller's death that on February 19, 2009, Defendant Sell confirmed, "Mr. Miller reports that he thinks of self harm and suicide daily." (Exhibit 47)

87.     The defendants knew or should have known prior to Miller's death that on March 3, 2009, Miller's treatment team met, Miller was classified as a MH-2A – Serious Mental Illness. The treatment team confirmed, *"[Miller] recently spent the majority of the last 60 day review in restrictive status placement due to displays of self injurious and/or acute emotional dysregulation episodes."* (Exhibit 48)

88.     The defendants knew or should have known prior to Miller's death that on March 14, 2009, it was confirmed that Miller was refusing his medications despite the fact that there was a court order in place. (Exhibit 49)

89.     The defendants knew or should have known prior to Miller's death that on March 22, 2009, Miller attempted to hang himself by tying a sheet around his neck. (Exhibit 50)

90.     The defendants knew or should have known prior to Miller's death that on March 22, 2009, Miller was pounding on his cell door, banging his head on the cell door, and attempting to tie a sheet around his neck in an attempt to harm himself; therefore Miller was placed in observation status. (Exhibit 50)

91.     The defendants knew or should have known prior to Miller's death that on March 24, 2009, Miller rammed his head and punched the window with his fist, in an attempt to harm himself; therefore he was placed into restraints. (Exhibit 51)

92.     The defendants knew or should have known prior to Miller's death that on March 25, 2009, Miller was taken to Mercy Medical Center because he was not eating because he wanted to die. (Exhibit 52)

93.     The defendants knew or should have known prior to Miller's death that on March 26, 2009, it was recorded that Miller had refused to eat his last four meals. (Exhibit 53)

94.     The defendants knew or should have known prior to Miller's death that on March 3, 2009 Defendant, Social Worker, Sally Farley recorded, "Inmate Miller had resided at WRC for nearly 9 months now and *he recently spent the majority of the last 60 day review in restrictive status placement due to displays of self injurious and/or acute emotional dysregulation episodes. Dangerousness to self statements or gestures rose to the acuity level of warranting a Chapter 51.20 proceeding and a 6 month court order for Involuntary Medication Administration.*" (Exhibit 54)

95.     The defendants knew or should have known prior to Miller's death that on April 6, 2009, Treatment Specialist Michelle O' Neil recorded that Miller was in need of closer monitoring. (Exhibit 55)

96.     The defendants knew or should have known prior to Miller's death that on April 12, 2009, Miller walked out of the shower and purposely banged the back of his head on the wall in an attempt to harm himself. (Exhibit 56)

97.     The defendants knew or should have known prior to Miller's death that on April 12, 2009, Miller attempted to hang himself by tying a sheet around his neck and therefore was placed in restraints. While in restraints a padded helmet was placed on Miller which he bit pieces off the padding and swallowed in an attempt to harm himself. (Exhibit 56)

98.    The defendants knew or should have known prior to Miller's death that on March 20, 2009, Defendant Sell recorded, "*Mr. Miller reports that he thinks of self harm and suicide daily.*" (Exhibit 57)

99.    The defendants knew or should have known prior to Miller's death that on April 30, 2009, Miller jumped from the sink in his cell onto his head in an attempt to harm himself. (Exhibit 58)

100.    The defendants knew or should have known prior to Miller's death that on May 1, 2009, Miller was punching the walls in his cell in an attempt to harm himself. (Exhibit 59)

101.    That on May 2, 2009, Miller was placed in mechanical restraints because of threats of self harm and self-harming activities. (Exhibit 60)

102.    The defendants knew or should have known prior to Miller's death that on May 3, 2009, Miller was placed in full bed restraints after taking approximately ten puffs of his albuteral inhaler and then broke the plastic case into several small pieces, ingesting approximately 4-5 pieces in an attempt to harm himself. (Exhibit 61)

103.    The defendants knew or should have known prior to Miller's death that on May 4, 2009, Miller swallowed a brown paper towel with a liquid cleaner absorbed on it in an attempt to harm himself. (Exhibit 61)

104.    The defendants knew or should have known prior to Miller's death that on May 5, 2009, Miller was continuously banging his head until he caused an injury to his skull. (Exhibit 62)

105.    On June 7, 2009, Miller swallowed a pencil, a segregation pen, two eye glass lenses, and a room key because he wanted these items to kill him. (Exhibit 63)

106.    The defendants knew or should have known prior to Miller's death that on June 8, 2009, Miller had be taken to an outside clinic because he had ingested a pencil, a seg pen, and two eye glass lenses in an attempt to harm himself. (Exhibit 64)

23

107.    The defendants knew or should have known prior to Miller's death that on June 18, 2009, just prior to Miller's transfer, Defendant Michlowski recorded, "Clinical Course has been <u>very</u> <u>problematic</u> with significant self abuse (eg) head banging – ramming head into wall etc. Medications have been helpful including prn Lorazepan but above behavior persists and is largely a function of Axis II type issues."  (Exhibit 1)

108.    The defendants knew or should have known prior to Miller's death that on June 18, 2008, Defendant Sell recorded, "Mr. Miller reports that he thinks of self harm and suicide daily." (Exhibit 65)

109.    The defendants knew or should have known prior to Miller's death that on June 19, 2009, Defendant Michlowski ordered Miller's discharge medications and added a note to the next provider, "any questions phone call undersigned at [phone number omitted] and see [progress note 06/18/08].  (Exhibit 66)

110.    The defendants knew or should have known prior to Miller's death that on June 19, 2009, Miller chart was reviewed by the defendant  (John Doe) at CCI who signed his/her name as follows,



Despite the fact that Miller's clinical course had been very problematic with significant self abuse and suicide attempts, this defendant took no action to assure Miller's safety and allowed him to be placed in a unit with no monitoring or observation, providing him access to materials which can be used to commit suicide and subsequently provided Miller the opportunity to harm himself and take his own life.(Exhibit 1)

111.    That on June 19, 2009, a transfer screening was conducted by defendant (Jane Doe)

PRINT NURSE'S NAME   Jennifer A. DCua

It was confirmed that Miller not be given access to incapacitating agents after his problem list and medical history were reviewed.  Nevertheless, Miller's was inexplicably and indifferently placed in a unit and this defendant took no action to assure Miller's safety and allowed him to be placed in a unit with no monitoring or observation, providing him access to materials which can be used to commit suicide and subsequently provided Miller the opportunity to harm himself and take his own life.  (Exhibit 5)

112.    That after Miller's death it took an extensive search to find his chart in HSU. (Exhibit 67)

113.    That on June 19, 2009 Miller was transferred from the WRC to CCI despite his recent self-harming and suicide attempts and acute mental health issues.  (Exhibit 68)

114.    That on June 19, 2010 Miller met with Defendant Tobiasz, who determined that Miller would be placed in SMU Unit, which provided no observation or monitoring of Miller. (Exhibit 68)

115.    Defendant Tobiasz admitted that Miller's diagnoses were deferred on June 19, 2009 because a review of the file had not been completed at that time.  (Exhibit 68)

116.    Defendant Tobiasz required that Miller should be routinely monitored by psychological services while housed in the SMU unit, yet this did not occur.  (Exhibit 68)

117.    That Miller was court committed to the custody of Department of Health Services until August 23, 2009, and remained under their commitment proceedings at the time his death. (Exhibit 4)

## EVENTS OF JUNE 22-23, 2009

118.     That on June 22, 2009, Miller was found unresponsive on the floor of his cell in Cell 36 in Housing Unit # 7. (Exhibit 69)

119.     That despite the fact defendants knew or should have known about Miller's severe mental illness and numerous suicide attempts, he was inexplicably and indifferently placed in a cell with no observation and linens that could be used to make a ligature to effectuate suicide. (Exhibit 69)

120.     That an investigator from the Columbia Sherriff's Department found in Miller's cell, "Miscellaneous pieces of what appears to be ripped bed sheet knotted together to form a makeshift rope. This particular item was the item found on Inmate Miller's neck but had been removed by CCI staff but remained in the cell until collected by me. With this bed sheet found in close proximity to the knotted sheet that I believed to be the original sheet where the strips were ripped from." (Exhibit 70)

121.     That on the evening of June 22, 2009, Defendant Severson found Miller on the floor pulse less, non-breathing and with a ligature around his neck and blood on his neck. (Exhibit 69)

122.     That despite Miller's obvious state of distress, Defendant Severson left the area of Miller's cell and returned to the Control Bubble. (Exhibit 69)

123.     That Defendant Severson only checked on Miller after being told my inmate Salas, who had to obtain Defendant Severson's attention, that there had been a thump in Miller's cell ten minutes earlier. (Exhibit 69)

124.     That Defendant Severson discovered Miller's pulse less non-breathing body, with blood on his chest and face at 11:58 p.m. (Exhibit 69)

125.    That Defendant Severson was not aware of when the last time rounds were conducted or when Miller was last checked prior to his death, but approximated it had been at least an hour. (Exhibit 70)

126.    That Defendant Severson attempted to rouse Miller before activating any alarms. (Exhibit 70)

127.    That when the alert code was sounded, "there was complete silence for several moments;" therefore Defendant Quade called Control over the radio and asked why the alarm had not been sounded. (Exhibit 71)

128.    That as the defendants gathered to enter Miller's cell, "Miller did not look right at this time." (Exhibit 72)

129.    That as Defendant Bath arrived at Miller's cell he saw Miller lying on his back with a white cloth wrapped around his neck; therefore, Defendant Bath ran back down to HU-7 control bubble to get the rescue knife. (Exhibit 73)

130.    That as Defendant Bath returned with the rescue knife Defendant Boodry directed him to return to the control room to retrieve the shield before the team could enter Miller's cell. (Exhibit 74)

131.    That none of the defendants called for medical attention until after an entry team had been assembled outside of Miller's cell. (Exhibit 72)

132.    That Defendants entered Miller's cell, secured him to the floor with a shield and applied restraints before attempting to remove the ligature from his neck. (Exhibit 74)

133.    That Defendant Persons did not arrive on scene with an AED until five minutes after a cell entry had been performed. (Exhibit 73)

134.    That Defendant Millard believes that he conducted rounds and last checked on Miller at approximately 11:00 p.m. (Exhibit 70)

135.     That shortly after the Miller's pulse less non-breathing body was found Inmate Salas was interviewed by investigators, at which time Salas was not aware of Miller's death. (Exhibit 70)

136.     Inmate Salas told Columbia County Sherriff's Department Investigators that 'he heard a pounding or a thumping noise on inmate Miller's wall and stated as a result of that he knocked on his door to get the officer's attention.  Inmates Salas stated approximately 25 minutes later an officer came by his door at which point he told the officer that he heard a thumping noise in inmate Miller's cell that sounded like something had hit the wall." (Exhibit 70)

137.     That inmate Salas told Columbia County Sherriff's Department Investigators that he witnessed Miller refuse his medications at 8:30 p.m. (Exhibit 70)

138.     That Sgt. Daniel Harrison recorded the following, "Later in the morning on Tuesday, June 21 (sic), 2009, I received from Columbia Correctional Institute the incident reports pertaining to this matter as well as Inmate Miller's medical records.  I briefly went through Inmate Miller's medical records and found a number of documents indicating prior suicidal thoughts and attempts by Inmate Miller.  I further observed documentation of a substantial amount of medications Inmate Miller is taking currently or in the past for mental health-related issues." (Exhibit 70)

139.     That Sgt. Daniel Harrison recorded, "I further document and/or note in the Columbia Correctional Institution incident report that Mr. Miller was found by staff members lying on the floor of his cell with bed sheet-type material around his neck.  Mr. Miller was not suspended from his bunk or anything else in his cell, and it is believed that Miller must have been suspended at some point due to ligature marks on his neck, however, over time the securement (sic) must have loosened resulting in the weight of Miller's body taking him to the floor, which I believe is supported by the statements made by Inmate Salas." (Exhibit 70)

140.     That the defendants, each and everyone, were intentionally, recklessly and/or deliberately indifferent to taking the necessary precautions to protect the life and well-being of Miller

and ignored his Constitutional, civil, and statutory rights by failing to medicate Miller in accord with Court orders, failing to have immediate access to Miller, failing to provide remotely adequate observation of Miller, failing to provide Miller any mental health care, providing him the material which to commit suicide all resulting in a substantial cause of Miller's death.

## VI.   VIOLATIONS OF LAW
## COUNT ONE - WRONGFUL DEATH & SURVIVOR STATUTES

141.   Realleges and incorporates herein by reference the allegations of the preceding paragraphs.

142.   The Allegations in Count One are alleged against all defendants.

143.   That Miller's death was caused by defendants' wrongful acts, negligence, neglect, default and/or improper conduct.

144.   That if Miller's death had not ensued he would have been able to bring a claim against the above named defendants for violations of Title 42 of the United States Code, Sections 1983 and 1985 for violations of his rights under the Eighth and Fourteenth Amendment to the U.S. Constitution.

## COUNT TWO - CRUEL AND UNUSUAL PUNISHMENT
## IN VIOLATION OF THE EIGTH AND FOURTEENTH AMENDMENTS
## TO THE UNITED STATES CONSTITUTION

145.   Realleges and incorporates herein by reference the allegations of the preceding paragraphs.

146.   The allegations in Count Two are alleged against all Defendants.

147.   That Defendants' deliberate indifference to Miller's known severe mental illness and health and welfare was a substantial cause of Miller's avoidable pain and subsequent death.

148.   That Defendants' policies, practices, acts, and/or omissions constituted deliberate indifference to the serious health care needs of Miller and violated the cruel and unusual punishment

clause of the Eight Amendment, made applicable to the States through the Fourteenth Amendment to the Unites States Constitution.

149.    That Defendants' policies, practices, procedures, acts, and/or omissions placed Miller at an unreasonable, continuing and foreseeable risk of developing or exacerbating his severe mental illness and committing suicide, which was a substantial cause of his death.

150.    That as a proximate result of Defendants' unconstitutional policies, practices, procedures, acts, and/or omissions, Miller unnecessarily suffered physical, psychological, and emotional injury, and eventually lost his life.

## VII.    DAMAGES

151.    Realleges and incorporates herein by reference the allegations of the preceding paragraphs.

152.    That as a direct result of the unlawful acts of the defendants Miller unnecessarily suffered serious emotional and psychological distress, pain and suffering, permanent physical and mental injury, loss of future enjoyment of life, loss of companionship with his friends, family, and siblings, and death; therefore his estate is entitled to monetary damages in an amount to be determined at a trial of this matter.

153.    That as a direct result of the unlawful acts of the defendants, Wesley James Stewart, a minor, has suffered the loss of society and companionship of his brother and is entitled to monetary damages in an amount to be determined at a trial of this matter.

154.    That as a direct result of the unlawful acts of the defendants, Nakita Marie Falkenstein, a minor, has suffered the loss of the society and companionship of her brother and is entitled to monetary damages in an amount to be determined at a trial of this matter.

## VIII.   CONDITIONS PRECEDENT

155.   Realleges and incorporates herein by reference the allegations of the preceding paragraphs.

156.   All conditions precedent to this lawsuit within the meaning of Rule 9(c) of the Federal Rules of Civil Procedure have been performed or have otherwise occurred.

## IX.   PRAYER FOR RELIEF

157.   WHEREFORE, the plaintiffs demand judgment awarding compensatory damages in an amount determined by the jury, awarding punitive damages in an amount determined by the jury as against the individually named defendants, awarding the reasonable costs and expenses of this action including a reasonable attorney's fee and their out-of-pocket expenses and granting the plaintiffs such other and further relief as may be just.

158.   That the State of Wisconsin is liable pursuant to Wis. Stat. §895.46 for payment of any judgment entered against the defendants in this action because said defendants were acting within the scope of their employment when they committed the above-mentioned actions.

## X.   DEMAND FOR JURY TRIAL

159.   The plaintiffs' demand trial by jury of all issues triable of right to a jury in this action.

Dated at Pewaukee, Wisconsin this 17th day of December, 2010.

GENDE LAW OFFICE, S.C.
Attorney for Plaintiffs

By: _____
James J. Gende II
State Bar No. 1030921
Christopher P. Katers
State Bar No. 1067557
ckaters@jamesgendelaw.com

31

**MAILING ADDRESS:**
N28W23000 Roundy Dr. Ste 200
Pewaukee, WI  53072
Telephone:  (262) 970-8500
Facsimile:   (262) 970-7100