IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THE ESTATE OF JESSIE MILLER,
by Robert Bertram, Special Administrator,

      and

WESLEY JAMES STEWART (A minor) and
NAKITA MARIE FALKENSTEIN (A minor),

                Plaintiffs,                OPINION AND ORDER

    v.                                            10-cv-807-wmc

THOMAS MICHLOWSKI, MD, MPH; RYAN
TOBIASZ, PSY.D; SALLY FARLEY; DR. CARLO
GANAAN; TERALYN SELL; JENNIFER DE GROOT;
BARBARA WAEDEKIN, M.D., LIEUTENANT
BOODRY; CAPTAIN M. JOHNSON; SERGEANT
SEVERSON; OFFICER MILLARD; OFFICER HERBRAND;
OFFICER BATH; OFFICER QUADE; PAUL PERSSON, R.N.;
WARDEN GREGORY D. GRAMS; DEPUTY WARDEN
MARC C. CLEMENTS; JANEL M. NICKEL; LORI E. ALSUM;
MARTHA BREEN-SMITH; STEPHEN J. NOVACHECK, MD;
BRYAN BARTOW; RCK RAEMISCH; KEVIN KALLAS, M.D.;
DONALD R. HANDS, PH.D; KAREN TIMBERLAKE; JANE
DOE, R.N.; JOHN DOE,

                Defendants.

      The Estate of Jessie Miller and two of Miller's siblings allege that defendants acted

with deliberate indifference while Miller was incarcerated by the State of Wisconsin,

violating state tort law and the Eighth and Fourteenth Amendments of the United States

Constitution, and depriving Miller and his minor siblings of their civil rights under 42

U.S.C. § 1983.  Defendants move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6),

arguing that plaintiffs' claims are barred by a combination of state immunity from suit,

qualified immunity, and failure to plead that Wisconsin statutory prerequisites for suit were met.

The court will grant defendants' motion to dismiss all claims against them in their official capacity on the basis of state immunity from suit in federal court, but will deny defendants' motion to dismiss all state law claims for failure to plead a statutory prerequisite to suit.  The court will also grant defendants' motion to dismiss all § 1983 claims, except with respect to defendants Bath, Boodry, Herbrand, Johnson, Millard, Quade, Severson, Tobiasz and Jennifer Nickel (aka Jane and John Doe).  Finally, the court will deny plaintiffs' motion for appointment of a guardian ad litem for minor plaintiffs Wesley James Stewart and Nakita Marie Falkenstein.

FACTUAL ALLEGATIONS

Dismissal pursuant to Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  To survive a motion to dismiss, a complaint "must plead factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (U.S. 2009).  Plaintiffs need not provide detailed factual allegations, but must provide "enough facts to raise [their claim] above the level of mere speculation."  *Riley v. Vilsack*, 665 F. Supp. 2d 994, 997 (W.D. Wis. 2009).  The court will construe all of plaintiffs'

factual allegations as true and draw all reasonable inferences in plaintiffs' favor.   *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir.  2006).[1]


### A.  The Parties

The Estate of Jessie Miller represents the interests of the late Jessie Miller, a former inmate at the Wisconsin Resource Center (WRC) and Columbia Correctional Institute (CCI).   Plaintiffs Wesley James Stewart and Nakita Marie Falkenstein are Miller's two minor siblings.

At the time when the alleged actions took place:

- *DHS* & *WDOC Defendants*.  Karen Timberlake was the Secretary of the Wisconsin Department of Health Services; Rick Raemisch was the Secretary of the Wisconsin Department of Corrections (WDOC); Kevin Kallas was WDOC's Mental Health Director; and Donald R. Hands was its Psychology Director.

- *WRC Defendants*.  Bryan Bartow was the Director of WRC; Thomas Michlowski was Miller's primary care physician; Carlo Gaanan was Miller's medical doctor; Barbara Waedekin was Miller's primary care psychiatrist; and Teralyn Sell and Jennifer De Groot were Miller's psychologists.

- *CCI Defendants*.  Gregory Grams was the Warden of CCI; Marc Clements was its Deputy Warden;  Janel Nickel was a segregation complex manager/security director; Lori Alsum was the Health Services Supervisor; Martha Breen-Smith was the

---

[1] Plaintiffs attached numerous exhibits to their complaint.  The facts included in these exhibits are treated as facts alleged, and trump language in the complaint itself in the event of a conflict.  *See Graue Mill Dev. Corp. v. Colonial Bank* & *Trust Co.*, 927 F.2d 988, 991 (7th Cir. 1991).

Psychological Services Manager; Stephen Novacheck was the Medical Director; Ryan Tobiasz was a psychological associate; Paul Persson was a nurse; "Jane Doe" and "John Doe" were also nurses; and Lieutenant Boodry, Captain M. Johnson, Sergeant Severson, Officer Miller, Officer Herbrand, Officer Bath, and Officer Quade were guards.

- Defendant Sally Farley was a social worker for the State of Wisconsin.

### B.  Background

Jessie Miller had a long, well-documented history of self-abuse and suicide attempts.  At the age of 16, he jumped from the top of a three-story building.  Since at least 2007, he had been in the custody of the State of Wisconsin, where he had been repeatedly diagnosed with mental health issues.  Various doctors stated that Miller posed a high suicide threat and had serious mental health problems.  At least one stated that he required "psychiatric medication." (Compl. (dkt. #1) ¶¶ 50, 52.)

On November 10, 2007, Miller attempted suicide while in Dane County Jail.  On June 4, 2008, Miller attempted suicide by hanging himself with a sheet at Dodge Correctional Institution.

Because of these attempts, Miller was "priority transferred" to the Wisconsin Resource Center.  There, he continued to harm himself by swallowing razor blades and smashing his head and limbs violently against the inside of his cell.  While at WRC, Miller stated that he had thoughts of suicide on a daily basis, and his psychologist described him as "a severely mentally disturbed patient."  At one point, Miller stated that he would commit suicide if returned to a facility run by the Department of Corrections.

4

In the spring of 2009, Miller's suicidal behavior increased in frequency, and officials at WRC recorded several suicide/self-harm attempts.  Miller was placed on "restrictive status," which at times meant being placed in physical restraints.  His psychiatrists again noted in his medical file that medication was necessary to control this behavior.

**C. Suicide**

On June 19, 2009, Miller was transferred from the Wisconsin Resource Center to the Columbia Correctional Institute.  The file that accompanied Miller to CCI contained information about his mental illness and long history of suicide attempts, and directed CCI staff to read Miller's latest progress report and to call MRC staff if there were any questions.

When Miller arrived at CCI, a nurse, "Jane Doe," reviewed Miller's medical chart and noted that Miller should be put on psychiatric medication and denied access to "incapacitating agents."  (Compl. Exhbt #5 (dkt. #1-6).)  That same day, Miller met with Ryan Tobiasz, a psychological associate at CCI.  Without reviewing Miller's medical file, Tobiasz placed Miller on segregation status in the Special Management Unit.  There, Miller received no special monitoring or observation, and was provided access to bedsheets, a material that Miller had previously used to attempt suicide.  (Compl. (dkt. #1) ¶ 110.)

At 8:30 pm on the evening of June 22, Miller refused his prescribed medications.  Between 11:00 and 12:00 pm, Miller committed suicide by hanging himself with his

bedsheet.  At some later point, an inmate housed near Miller heard a loud thump from Miller's cell.  The inmate banged on his cell door, calling out to Sergeant Severson for help.  Severson finally arrived 25 minutes later, and the inmate told him what he had heard.  At 11:58, Sergeant Severson inspected Miller's cell and found him on the floor with a ligature around his neck.  Miller had no pulse and was not breathing.[2]  At that time, it had been approximately an hour since any guard had walked past Miller's cell.

Severson attempted to rouse Miller verbally before activating any alarms.  When Severson sent a signal to activate the alarm, it was several moments before the alarm actually sounded.  Even after the alarm sounded, the responding guards did not call for medical assistance until they had all assembled outside Miller's cell.  Once outside, they would not enter until one of them went back to the control center to retrieve a safety shield.  A nurse with a defibrillator arrived five minutes after the guards entered the cell.

OPINION

Plaintiffs seek relief on behalf of the deceased, Jessie Miller, in the form of a survival action pursuant to 42 U.S.C. §§ 1983 and 1988 (applying Wis. Stat. § 895.01 and § 895.03).  (Compl. (dkt. #1) ¶¶ 3, 144.)  The court also finds that the complaint invokes relief for Jessie Miller's minor siblings in the form of a wrongful death action (Compl. (dkt. #1) ¶¶ 153-54) pursuant to 42 U.S.C. §§ 1983 and 1988 (applying Wis. Stat. § 895.04(4)).

---

[2] It is unclear from the record whether Severson actually entered Miller's cell at this time -- presumably he had some physical access to Miller's body if he was able to determine that he had no pulse.

6

Plaintiffs' primary claim is that defendants are liable under 42 U.S.C. § 1983 in both their official and personal capacities, having violated Miller's Eighth Amendment rights and his minor siblings' Fourteenth Amendment Rights.  (Compl. (dkt. #1) ¶¶ 3, 145-50.)[3]

## I.        Claims Against Defendants In Their Official Capacity

Plaintiff purports to sue all defendants in their official capacity, as employees of the State of Wisconsin.  (Compl. (dkt. #1) ¶¶ 1, 38.)  All such claims will be dismissed, for the reasons noted below.

Plaintiffs' § 1983-based claims against defendants in their official capacity are not legally cognizable.  "[S]ection 1983 does not authorize suits against states (states not being 'persons' within the statue's meaning) . . . . [and a] suit against a state official in his or her official capacity is a suit against the state."  *Power v. Summers*, 226 F.3d 815, 818 (7th Cir. 2000).

---

[3]  The complaint does not identify a Wisconsin state law claim against defendants, nor does the complaint invoke supplemental jurisdiction for such a claim.  Both plaintiff and defendant, however, have briefed the instant motion as if there is a state law claim.  For expediency, the court will proceed as if a state law claim has been pled and that supplemental jurisdiction is available -- at the least, it can discern the outlines of a tort negligence claim.  (*See* Compl. (dkt. #1) ¶ 143.)  Plaintiffs will be given leave to amend the complaint to clarify any state law claims against the remaining defendants and the necessary basis for jurisdiction, as well as compliance with the notice requirements in Wis. Stat. § 893.82.  (The parties disagree as to the necessity of pleading specific compliance with § 893.82, but whether or not it is necessary to establish subject matter jurisdiction, it is at least a procedural hurdle to plaintiffs proceeding on any state law claim.  Accordingly, the court directs plaintiffs to plead specific compliance at the outset for purposes of this case.)  The court declines to exercise supplemental jurisdiction over any state law claims against the dismissed defendants consistent with the Seventh Circuit's "well-established" practice.  *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).

Plaintiffs' state law tort claims against defendants in their official capacity, if any, are barred from proceeding in federal court by the Eleventh Amendment. "A suit [for money damages] against a state official in his or her official capacity is a suit against the state, and so is barred by the Eleventh Amendment unless (so far as pertains to this case) the state has waived its Eleventh Amendment immunity from suit in federal court." *Id.* There is no indication that Wisconsin has waived its immunity here.

## II.     Section 1983 Claims Against Defendants In Their Personal Capacity and Defendants' Personal Immunity Defense

### A. Qualified Immunity Test

Defendants assert that all claims against them should be dismissed on the basis of their qualified immunity from suit. "Qualified immunity shields from [suit] government officials who are performing discretionary functions in the course of duty to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999) (quoting *Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir. 1995)) (internal quotation marks omitted).

Defendants may invoke qualified immunity by showing that the suit targets behavior arising out of the performance of their discretionary official duties. *Leaf v. Shelnutt*, 400 F.3d 1070, 1079-80 (7th Cir. 2005). Once the qualified immunity defense is successfully invoked, plaintiffs may only defeat it by passing a two-pronged test. *Pearson v. Callahan,* 555 U.S. 223 (2009) (indicating that the test may be treated as containing two equal parts, and not necessarily as two sequential steps). Under the first

8

prong, the plaintiff must "show the [state actor]'s conduct violated a [legal] right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. 223. Under the second prong, the court must show that "the right was clearly established." *Id.*

A plaintiff can show that a right was "clearly established," by demonstrating "that a violation of this right has been found in factually similar cases." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008).[4] Alternatively, a plaintiff need not point to a factually-similar case if "the violation was so clear that a government official would have known that his actions violated the plaintiff's rights." *Id.* at 512. In either scenario, a plaintiff must show that the law provided defendants with "fair warning" that his conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 731 (2002) (rejecting the Eleventh Circuit standard that a previous case must be "fundamentally similar" to be clearly established).

## B.   Propriety of Granting 12(b)(6) Dismissal on Qualified Immunity Grounds

As an initial matter, both sides hotly dispute whether it is legally permissible to dismiss a case at the pleading stage on the basis of qualified immunity. This disagreement is understandable. Seventh Circuit case law from the past decade reflects confusion about this "now-familiar paradox of the qualified immunity doctrine -- [that] the defendant must essentially win on the merits to demonstrate that the case ought to

---

[4] This does not require a prior case that is "precisely on all fours on the facts and law involved." *Landstrom v. Ill. Dep't. of Children & Family Servs.*, 892 F.2d 670, 676 (7th Cir. 1990).

be disposed of at the threshold."  Larry Alexander & Evan Tsen Lee, *Is There Such a Thing as Extraconstitutionality?*, 27 Ariz. St. L.J. 845, 858 (1995).

On one hand, both the United States Supreme Court and the Seventh Circuit Court of Appeals have stated that at the pleading stage a plaintiff is not required to anticipate and overcome the defense of qualified immunity.  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Elliott v. Thomas*, 937 F.2d 338, 345 (7th Cir. 1991).  The Seventh Circuit has described as "well established" "[t]he principal that the determination of immunity need not be made at the earliest opportunity if a fuller development of the record would be helpful to a sound decision." *Hunafa v. Murphy,* 907 F.2d 46, 49 (7th Cir. 1990).  In another case, the court noted that "[b]ecause an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate." *Alvarado v. Litscher*, 267 F.3d 648, 651–52 (7th Cir. 2001).  *See also Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008) (explicitly affirming this same point).  In a concurring opinion, Judge Easterbrook similarly noted that "Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal . . . . when defendants do assert immunity it is essential to consider facts in addition to those in the complaint." *Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring).

On the other hand, the Seventh Circuit has regularly granted and upheld 12(b)(6) dismissals based on qualified immunity in recent years.  *See Justice v. Town of Cicero*, 577 F.3d 768, 773 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 3410 (2010); *Steidl v. Fermon*, 494 F.3d 623, 624, 632-34 (7th Cir. 2007); *Vose v. Kliment*, 506 F.3d 565, 566, 572 (7th Cir. 2007), *cert. denied*, 553 U.S. 1064 (2008); *Snyder v. Nolen*, 380 F.3d 279, 281-82 (7th

10

Cir. 2004), *reh. en banc denied*; *Doyle v. Camelot Care Ctrs, Inc.*, 305 F.3d 603, 608-09, 612-13 & 623 (7th Cir. 2002); *Sanville v. McCaughtry*, 266 F.3d 724, 734-37, 739-40 (7th Cir. 2001).

Defendants add that the Supreme Court's recent decision in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), casts into doubt the Seventh Circuit's previous admonishments against dismissing a case on qualified immunity.   This appears an overstatement.   While *Iqbal* stressed the importance of settling the question of qualified immunity at the earliest possible stage, it is not clear *Iqbal* supports the proposition that all types of qualified immunity defenses are suitable for 12(b)(6) dismissal.   *Id.* at 1953.   *Iqbal*'s holding centered around whether the plaintiff alleged facts adequate to plead an injury.   In *Iqbal*, the court explained "the complaint must contain facts plausibly showing that petitioners purposefully adopted a policy of classifying post-September-11th detainees as 'of high interest' because of their race, religion, or national origin."   *Id.* at 1951-52.   Since the complaint failed to do that, the court found the "[plaintiff had] not "nudged [his] claims [of invidious discrimination] across the line from conceivable to plausible."   *Id.*

This is essentially what the first prong of the qualified immunity test requires.   But the holding is distinguishable from the alternative situation in which a plaintiff has met the first prong, yet failed the second prong of the qualified immunity test.

In light of both *Iqbal* and the legitimate policy considerations identified by the Seventh Circuit, it would appear proper to dismiss a complaint at the 12(b)(6) stage on qualified immunity grounds when it may be said that dismissal has not burdened the plaintiff with anticipating the qualified immunity defense.   Put concretely, a court may

dismiss a deliberate indifference claim at the pleading stage in at least two instances:

(1) If the essential facts alleged in the complaint fail to support the first prong of the qualified immunity test;[5] or

(2) If the essential facts alleged in the complaint fail to support the second prong of the qualified immunity test provided that no matter what facts may later come to light, the asserted constitutional violation would not be *obvious* at the time of the alleged deprivation as a matter of law.

*See Jacobs*, 215 F.3d at 765 n.3 ("[I]n some cases, a complaint may be dismissed under Rule 12(b)(6) on qualified immunity grounds where the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred."); *Atkins v. City of Chicago*, 631 F.3d 823, 829 (7th Cir. 2011) ("[T]here is no need to decide in this case whether there might be a constitutional entitlement to a judicial hearing in cases of alleged mistaken identity of parole violators. For even if the question were answered in the plaintiff's favor, it would not warrant any relief. . . . The question is novel, and the defendants therefore protected from liability.").

### C.  Applying the Qualified Immunity Test to Plaintiffs' 8th Amendment Claim

In response to the claims made against them in their individual capacities, defendants invoke the defense of qualified immunity.  To defeat this defense, plaintiffs

---

[5] Under Rule 8(a)(2), plaintiffs already bear the burden of pleading facts adequate to show a violation of the law.  Thus, the first prong of the qualified immunity test and the burden of 8(a)(2) are essentially the same.  Dismissing a case for failure to satisfy the first prong of the qualified immunity test, therefore, imposes no additional pleading burden on plaintiffs.

must satisfy the first prong of the qualified immunity test, and possibly the second prong as well (subject to the limits identified above).  The court considers each in turn.

### i.        Violation of a Legal Right

Under the first prong of the test, the court asks whether defendants' alleged conduct constituted a violation of Miller's Eighth Amendment rights.  The Eighth Amendment's prohibition against cruel and unusual punishment means that prison officials "must provide humane conditions of confinement; . . . must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotations omitted).  One way to violate this duty is to exhibit "deliberate indifference" to the medical needs of a prisoner.  *Id.* at 834.  A prison official exhibits deliberate indifference when (a) the inmate suffers from an "objectively, sufficiently serious" medical condition, *id.*, and (b) the official acts with a sufficiently culpable state of mind -- that is, he "knew of a substantial risk of harm to the inmate and disregarded the risk," *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996).

### a.  Medical Condition that is Objectively Serious

This element is clearly met for all defendants.  The complaint has pled that Jessie Miller committed suicide while in the custody of the State of Wisconsin.  According to the Seventh Circuit, "it goes without saying that suicide is a serious harm" and "[i]t would be difficult to think of a more serious deprivation than to be deprived of life." *Sanville*, 266 F.3d at 733.

### b. Subjective Knowledge Of, and Disregard For, the Medical Condition

The second part of this test is subjective -- whether defendants in fact knew of the condition, and then failed to take "reasonable preventative steps." *Estate of Novack v. Cnty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000). Here, it is necessary to consider the facts alleged by plaintiffs against the individual defendants. The court will look at both the complaint and attached exhibits, treating all of plaintiffs' factual allegations as true and drawing all reasonable inferences in plaintiffs' favor. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006). However, the court need not accept as true merely conclusory allegations. *Iqbal*, 129 S. Ct. at 1951.

- **Management-Level Defendants**

Plaintiffs allege that defendants' "policies, practices, procedures, acts, and/or omissions" contributed to Miller's suicide. (Compl. (dkt. #1) ¶ 149.) With regard to defendants Alsum, Breen-Smith, Clements, Grams, Hands, Janel Nickel, Novacheck, Raemisch and Timberlake, the complaint does not allege any knowledge of Miller's individual case. Instead, the complaint alleges that these management-level defendants should be liable because they were responsible for the overall functioning of a system that failed Miller. (*E.g.* Compl. (dkt. #1) ¶ 32.)

To be held liable under § 1983, a defendant must be "personally responsible for the deprivation of a constitutional right." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir.1995). A defendant "will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his

14

knowledge or consent." *Chavez v. Ill. State Police*, 251 F.3d 612, 652 (7th Cir. 2001). Since the court cannot reasonably infer from the alleged facts that any of these management-level defendants were aware of Miller's specific psychological needs, nor the treatment he received upon arriving at CCI, especially on the night of his tragic death, no actionable claim has been stated against them.

To the extent that plaintiffs allege that these defendants failed to adopt and enforce adequate suicide prevention policies or that they failed to train and supervise the guards and doctors, such allegations are unavailing, even if they can be inferred from the facts.  In the Eighth Amendment context, such claims may not be maintained against prison officials.  *Sanville*, 266 F.3d at 739.[6]

- **The Wisconsin Resource Center Defendants: Kallas, Bartow, Michlowski, Farley, Gaanan, Sell, De Groot, & Waedekin**

The complaint alleges that all of the above-named defendants directly participated in Miller's treatment and exhibited deliberate indifference by failing to ensure that Miller continued to receive adequate treatment and suicide prevention after he left the WRC. While plaintiffs' allegations arguably permit an inference that at least some of these defendants were aware of the substantial risk of suicide by Miller, the closer question is whether they failed to take reasonable steps to prevent the risk.

A state official continues to bear some burden for the safety of an inmate, even after the inmate has left his custody.  *See Cavalieri v. Shepard*, 321 F.3d 616, 623 (7th Cir.

---

[6] Similarly, the doctrine of respondeat superior does not apply to § 1983 actions.  *Sanville*, 266 F.3d at 739.  As alluded to below, it is possible that plaintiffs may be able to point to policies and procedures unreasonably adopted and enforced by some or all of the managerial defendants, but they have not done so in this complaint.

2003) (holding that a police officer should have warned a county correctional facility of an inmate's suicidal tendencies at the time of transfer from the local jail).  This burden is, of course, necessarily limited to the officials' authority.

Here, plaintiffs allege that the defendants at WRC compiled a detailed medical file on Miller during his stay (Compl. (dkt. #1) ¶¶ 54-109), and sent this medical information to CCI at the time of Miller's transfer, (Compl. (dkt. #1) ¶¶ 109, 138.) Moreover, plaintiffs allege this information was enough to warn CCI of the serious suicide risk Miller posed.  (Compl. (dkt. #1) ¶ 138.)  Therefore, the WRC defendants cannot be said to have failed to inform CCI staff of Miller's condition.

- **Columbia Correctional Institute Psychologists and Nurses Conducting Miller's Intake**

In the complaint, plaintiffs allege that those responsible for identifying Miller's treatment and monitoring needs at CCI had access to a file containing Miller's history of suicide attempts, medical opinions declaring him seriously mentally ill, and evidence of several attempts in the previous months.  (Compl. (dkt. #1) ¶ 138.)  The complaint alleges that Tobiasz, as the psychological associate, chose not to review Miller's file, relying only upon his interview with Miller.  (Compl., Ex. 2, 68 (dkt. ##1, 7.))  If Tobiasz was only negligent in failing to review the file of a new inmate with an acknowledged history of physical self-abuse (Tobiasz knew about Miller's past cutting issues), he may as a matter of law not be guilty of deliberate indifference.  *Farmer,* 511 U.S. at 826.  On the other hand, at this stage of the case, sufficient facts may still come to light that, contrary to Tobiasz's written notes, Miller presented as someone sufficiently disturbed as to *require* at least a cursory review of his medical file before placement.

16

While this may well still amount to negligence, perhaps even gross negligence, rather than deliberate indifference, the court will permit plaintiffs the opportunity to present facts in addition to those in the complaint before deciding the issue.

Plaintiffs have pled sufficient facts, taken in the light most favorable to their case, that "Jane and John Doe" -- who defendants assert is the same person (Jennifer Nickel) -- *were* aware of the substantial risk that Miller might take his own life.  Plaintiffs assert that the Does reviewed Miller's file, and from this one may infer they were subjectively aware of a substantial risk to Miller's health if left unwatched with access to a bed sheet.  If "the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."  *Id.* at 842-43.

The next question is whether the Does (likely Nickel) and Tobiasz took reasonable steps to prevent a serious harm.  "Deliberate indifference may be inferred . . . when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."  *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996.)  The facts alleged in the complaint and attached exhibits show that Tobiasz placed Miller in the special management unit and ordered that he be routinely monitored.  (Compl. (dkt. #1) ¶¶ 114, 116.)   Nickel wrote on Miller's chart a restriction against "incapacitating agents" and referred him to the Psychological Services Unit for medication.  (Compl., Ex. #6 (dkt. #1).)

There are no specific allegations as to what additional demands "accepted professional practice" might have been placed upon Tobiasz and Jennifer Nickel or other alleged "Does" involved in intake to alert other psychologists and prison staff members about the risk Miller presented to himself, but one can at least infer a serious lack of necessary communication between Nickel and Tobiasz and the unit guards given Miller's profound mental health issues and his recent suicide attempts.  On the bare facts alleged, Miller was given access to a bed sheet and placed under seemingly inadequate supervision for an inmate of his psychological state.  He was not placed on suicide watch, and guards checked on him every hour, giving him plenty of time to succeed in a suicide attempt. (Compl. (dkt. #1) ¶ 125.)  From this, plaintiffs have alleged enough facts to go forward on their claim of deliberate indifference against Tobiasz and the Does (Jennifer Nickel).

- **Columbia Correctional Institute Guards and On-Scene Nurse**

The complaint alleges that the on-duty guards, Boodry, Johnson, Severson, Millard, Herbrand, Bath and Quade, and the nurse, Persson, at the time of Miller's suicide at CCI all knew of his background and high risk of suicide.[7]  (Compl. (dkt. #1) ¶¶ 42-104, 106-10, 119.)  The issue is whether these defendants took reasonable steps to avoid the serious harm.  Plaintiffs allege that the guards patrolled by Miller's cell on, at most, an hourly basis.  They also allege that it took 25 minutes for a guard to respond to the calls for help from the inmate located next to Miller's cell.  (Compl. (dkt. #1) ¶ 136.)

---

[7]  The complaint alleges throughout that all defendants "knew or should have known" about Miller's psychological issues.  Except where the complaint specifically alleges a lack of actual knowledge or shows such knowledge is implausible (i.e., the management-level defendants), the court makes all inferences in plaintiffs' favor.  While this remains to be proven, it is certainly plausible that staff in a prison's special management unit would have to know salient medical facts about the inmates in their care.

Finally, they allege that an entire team of guards again delayed for several minutes before entering Miller's cell as they waited for a shield to protect them from one gaunt and malnourished inmate, who appeared to a guard to have just hung himself.  (Compl. (dkt. #1) ¶¶ 121-32.)  Reading the facts in the light most favorable to plaintiffs, (i.e., without speculating as to the reasons these guards may have followed a more rigid protocol under the circumstances), the court cannot say that as a matter of law this alleged failure to take reasonable steps to prevent serious harm to Miller could not be evidence of deliberate indifference.

Plaintiffs do not, however, allege facts about Nurse Persson sufficient to show that he failed to take reasonable steps to prevent the suicide attempt, or harm to Miller after the attempt.  Not only is there no plausible inference that he had responsibility to monitor Miller or the other inmates once placed in a cell, there is no indication that a five-minute delay in reaching the cell was an unreasonable amount of time for an emergency response.

### ii.     The Right Was Clearly Established

Whether a right was clearly established at the relevant time is a question of law. *Lewis v. Downey*, 581 F.3d 467, 478 (7th Cir. 2009).  Even so, the facts stated in the complaint are crucial, because the inquiry "must be undertaken in light of the specific [factual] context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  As noted above, the court has decided that since this case is at the 12(b)(6) stage, it will only dismiss if the pleadings claim a legal or constitutional violation so patently novel that as a matter of law the asserted violation cannot have

19

been obvious at the time of the alleged deprivation.

With respect to the remaining defendants (the guards on the scene, an intake psychological associate and an intake nurse), the complaint alleges failure to ensure proper monitoring of a very suicidal plaintiff.  Tragically, this general situation, in various factual permutations, has occurred many times in the past, as shown by the numerous case citations provided by plaintiffs and defendants.  The cited cases demonstrate the unremarkable proposition that, depending on the facts, when defendant guards and nurses are sued under § 1983 for deliberate indifference to a suicidal inmate, the plaintiffs sometimes win (*e.g.*, *Cavalieri v. Shepard*, 321 F.3d 616, 623 (7th Cir. 2003)) and sometimes lose (*e.g., Minix v. Canarecci*, 597 F.3d 824 (7th Cir. 2010)).  The court is not convinced from these cases, individually or in sum, that plaintiffs' have absolutely no chance of showing a "clear violation" of Miller's rights.  At this stage of the case, it would be putting the cart well before the horse to ask plaintiffs to plead with such specificity that we can discern whether the conduct of the remaining, individual defendants in this case was clearly a violation of plaintiffs' rights.

### III.        REQUEST FOR A GUARDIAN AD LITEM

The court agrees with defendants' contention that the federal rules do not require the court to appoint a guardian ad litem in this case, the minor plaintiffs being represented adequately thus far.  *Matter of Chicago, Rock Island & Pacific R. Co.*, 788 F.2d 1280, 1282 (7th Cir. 1986).  Although defendants will be disappointed to hear that the case proceeds beyond today,  the court also agrees that appointment of a guardian ad

litem at this point is unnecessary.  If settlement appears likely, the matter may be taken up anew.


ORDER

IT IS ORDERED that:

(1)    Defendants' motion to dismiss claims against all defendants in their official capacity is **GRANTED**.

(2)    Defendants' motion to dismiss all claims against defendants in their personal capacity on the basis of qualified immunity is **GRANTED** with respect to the following defendants: Alsum, Bartow, Breen-Smith, Clements, De Groot, Farley, Gaanan, Grams, Hands, Kallas, Janel Nickel, Michlowski, Novacheck, Persson, Raemisch, Sell, Timberlake and Waedekin and is **DENIED** with respect to the following defendants: Jane Doe & John Doe (aka Jennifer Nickels), Bath, Boodry, Herbrand, Johnson, Millard, Quade, Severson & Tobiasz.

(3)    Defendants' motion to dismiss state law claims on the basis of failure to plead Wis. Stats. § 893.82 is **DENIED** as to the remaining defendants.

(4)    Plaintiffs are given **LEAVE TO AMEND** the complaint to clarify the nature of any state law claims they may have as to the remaining defendants, and to explicitly plead that they have satisfied § 893.82, consistent with this court's opinion.

(5)    Plaintiffs' motion for appointment of guardian ad litem is **DENIED**.


Entered this 29th day of September, 2011.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge

21