1               UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF WISCONSIN

3   * * * * * * * * * * * * * * * * * * * * * * * * *

4   THE ESTATE OF JESSIE MILLER,
    by Robert Bertram, Special Administrator
5
            and
6
    WESLEY STEWART (a minor) and
7   NAKITA FALKENSTEIN (a minor)

8          Plaintiffs,

9     -vs-                      Case No. 10-CV-807-WMC

10  RYAN TOBIASZ, OFFICER BATH,    Madison, Wisconsin
    OFFICER HERBRAND, CAPTAIN      November 21, 2012
11  JOHNSON, OFFICER MILLARD,      9:00 a.m.
    JANEL NICKEL, OFFICER QUADE
12  and SERGEANT SEVERSON,

13          Defendants.

14  * * * * * * * * * * * * * * * * * * * * * * * * *

15   STENOGRAPHIC TRANSCRIPT OF TELEPHONIC MOTION HEARING
         HELD BEFORE CHIEF JUDGE WILLIAM M. CONLEY,
16

17  APPEARANCES:

18  For the Plaintiff:   Gende Law Offices, S.C.
                         BY:  JAMES GENDE, II
19                            CHRISTOPHER KATERS
                         N28 W23000 Roundy Drive, Ste. 200
20                       Pewaukee, Wisconsin  53072

21  For the Defendants:  Department of Justice
                         BY:  RICHARD BRILES MORIARTY
22                       17 West Main Street
                         Madison, Wisconsin  53703

23

24          Lynette Swenson   RMR, CRR, CBC
                  Federal Court Reporter
25     U.S. District Court   120 N. Henry St., Rm. 520
           Madison, WI  53703   (608) 255-3821

1        THE COURT:  Hello.  This is Judge Conley.  I am

2   calling Case Number 3:10-CV-807.  The Estate of Jessie

3   Miller versus -- I should say *The Estate of Jessie*

4   *Miller, et al. v. Ryan Tobiasz, et al.*  And I'll hear

5   appearances for the plaintiff.

6        MR. GENDE:  Morning, Your Honor.  James

7   Gende --

8        THE COURT:  I'm sorry, the sound wasn't quite

9   up.  James Gende.  And was there someone else?

10       MR. KATERS:  Christopher Katers.  K-a-t-e-r-s.

11       THE COURT:  Very good.  And for the defendants.

12       MR. MORIARTY:  Richard Briles Moriarty for the

13   defendants.  Nanette Scheel, a paralegal is also

14   present.

15       THE COURT:  Very good.  I have before me a

16   motion for protective order, and we'll style that as a

17   general motion, as well as a motion for protective order

18   regarding the Michlowski deposition.  I'm going to take

19   up the first of those motions, the general motion, and

20   then we'll talk about Mr. Michlowski's specific

21   situation.

22     I will start with the plaintiff who has brought

23   this motion and simply say that -- I'm sorry, the

24   defendant who has brought the motion --

25       MR. MORIARTY:  Thank you.

1    THE COURT:  -- and simply say that I am having

2  trouble because you've given me but one example of a

3  subject matter that you need protection from and I don't

4  think I agree with the example, and that is with respect

5  to discovery on policies and procedures that are in

6  place with regard to suicidal subjects.  My problem with

7  the specific example is that I would think it would be

8  appropriate at this point, given that the Seventh

9  Circuit has confirmed, that we need to understand the

10  circumstances surrounding the choices or the decision --

11  the choice to act or not to act by the defendants in

12  order to understand whether they acted with deliberate

13  indifference toward the -- towards Jessie Miller.  And I

14  will hear from the defendant on that subject.

15    MR. MORIARTY:  Okay.  Thank you, Your Honor.

16  The policies and procedures one I think you are

17  referencing is in -- is that the one in the Michlowski

18  notice?  All policies and procedures related to inmates

19  at risk of suicide at the Wisconsin Resource Center?

20    THE COURT:  Well, we'll come back to that.

21    MR. MORIARTY:  Oh, okay.

22    THE COURT:  I'm talking about generally that's

23  the only example I have of something that you believe

24  would go beyond the scope.  You're past the point of

25  arguing for general protections from discovery.  If you

1  weren't past it with this Court's decision, you're

2  certainly past it when the Seventh Circuit affirmed this

3  Court's decision.  And when I read your general motion

4  is that except for asking the very specific question

5  what did you know and when did you know it, there are no

6  subjects which are appropriate for discovery and that's

7  -- that's not only going to prevail, it's going to get

8  you sanctioned.

9      MR. MORIARTY:  Your Honor, the defendants

10  definitely have understood since the remand that some

11  discovery would occur.  Our point is that the Court had,

12  in its September 11th order, indicated discovery is

13  stayed except as is necessary to resolve the qualified

14  immunity issues.

15      THE COURT:  And then I went on to explain that

16  it's hard to think of an area with respect to the facts

17  surrounding this death that wouldn't be appropriate

18  subject matter and the burden would be on you to

19  identify it.  And yet I'm presented with a 30-page brief

20  which doesn't identify a single example.

21      MR. MORIARTY:  I apologize if I've been -- I

22  have not been precise, Your Honor.  Let me try and do

23  that here.  In, for example, the October 22nd Second

24  Request to Produce, they are asking for all emails

25  referencing Jessie Miller for the 30 days prior to his

1    death and up -- after his death up until the notice of

2    claim was filed.  Now what we're talking about is the

3    scope of proper discovery here.  I'm looking at

4    depositions that are being scheduled and notices that

5    are being scheduled and what is being conveyed is that

6    the plaintiffs are going to be seeking a broad range of

7    discovery without focusing on what's necessary to

8    resolve the qualified immunity issues.

9        For example, let's just assume that there's some

10   emails that went back and forth at Wisconsin Resource

11   Center, never got shared with CCI; emails went back and

12   forth at CCI, were never shared with any of the

13   defendants; how could that conceivably be, in my view,

14   necessary to resolve the qualified immunity issues?

15       They're asking also for emails exchanged between

16   participants of the mortality review.  Well, that's --

17   we have a confidential mortality review.  None of the

18   defendants were involved in that.  Mr. Gende knows that.

19   It's -- it does seem to me that what we're looking at is

20   a discovery situation that is way beyond what is

21   appropriate.

22       Now I understand the Court, and I may disagree on

23   what those limits are, but the Court did indicate that,

24   and I think appropriately so, that discovery was to be

25   limited to what is necessary to resolve the qualified

1   immunity issues.  If -- I did see in the Court's order

2   where you're saying well, essentially whatever is out

3   there in liability could be encompassed.  If, in fact,

4   that's going to be the Court's order, then we would have

5   a major disagreement which might require further action.

6   But if we had -- let me pick out an example there.

7        If we did not have qualified immunity involved in

8   this case at all, Mr. Gende could proceed with all sorts

9   of discovery in all sorts of ways that would be

10  completely unassociated with the actual suggested

11  knowledge of any defendant and the -- and what actions

12  they took so long as it could lead to relevant

13  information.  That would be the general standard.

14       In the qualified immunity setting, as we have put

15  forth in the brief, it is required by Supreme Court

16  authority that discovery be targeted, and so it cannot,

17  on its face, in my view, if it's targeted, it can't be

18  the same as the scope of overall liability discovery.

19            THE COURT:  I would agree with you if the

20  targeting had to do with damages.  But right now we're

21  trying to decide on liability and the standard in

22  discovery is what information may lead to admissible

23  evidence.  Your position -- even if I were to think

24  there were merit in it, and there may be with regard to

25  specifics, which I've yet to hear, but we'll come back

1  to that.

2          MR. MORIARTY:  Okay.

3          THE COURT:  Your position, which is simply

4  we're not going to allow discovery until we agree on the

5  exact parameters of that discovery, would halt virtually

6  all discovery in all cases.  It is obstructionist and I

7  am going to sanction the defendants, but before I get to

8  the sanction, I need to set parameters which you should

9  have set by stating specific objections to individual

10  questions.

11      Let's take the general example that you've given.

12  Emails 30 days before 30 days after.  I assume that

13  isn't all emails that were sent within the Division of

14  Corrections.  Correct?

15          MR. MORIARTY:  It says "produce all emails

16  and/or documents, files, records or other documents

17  referencing Jessie Miller for the 30 days prior to his

18  death and after the death up until the notice of claim

19  was filed on October 16th, 2009."  And then it goes on

20  to talk about the mortality review.  There is no

21  restriction at all --

22          THE COURT:  Well Counsel, there is a

23  restriction and it has to do discussing Jessie Miller.

24          MR. MORIARTY:  Right.  Yes.

25          THE COURT:  Now let's just take the 30 days

1  before.  What is your objection to producing all emails

2  that were produced with respect to the deceased Jessie

3  Miller before his death?

4        MR. MORIARTY:  Well, that encompasses

5  potentially all emails that are not just at the

6  Department of Corrections, but the Department of Health

7  Services.  It is directed -- there is a limitation in

8  that it is directed towards the defendants, who have a

9  limited amount of ability to get emails.  But the way

10  it's framed conveys that the plaintiffs intend to have a

11  very broad scope.

12        The --

13        THE COURT:  Mr. Moriarty.

14        MR. MORIARTY:  Yes.

15        THE COURT:  You put your clients and yourself

16  behind the eight ball by taking the position that you've

17  taken because not only have you delayed reasonable

18  discovery, that is to say all emails related to Jessie

19  Miller 30 days before his death, but now you've put me

20  in the position where I have to order that you do it on

21  an expedited basis.

22        MR. MORIARTY:  Your Honor --

23        THE COURT:  No, let me finish.

24        MR. MORIARTY:  Sorry.

25        THE COURT:  The government has difficulty

1  producing these kinds of documents even within the

2  normal time frames and now you're going to have to tell

3  me, because I am going to order that you produce all

4  such documents, that you can't possibly pull all those

5  documents together.

6      What efforts have you made to gather responsive

7  documents in the 30 days before death?

8          MR. MORIARTY:  Your Honor, might I say what

9  I've been referencing is not yet due.  No response is

10 yet due.

11         THE COURT:  Right.  But when is it due?

12         MR. MORIARTY:  It is due on Monday.

13         THE COURT:  And do you have it all gathered?

14         MR. MORIARTY:  We do have our materials -- we

15 are in the process of finalizing our materials as we

16 can, as it is directed, and we intend to respond

17 appropriately to those issues.

18         THE COURT:  And Mr. Moriarty, with respect to

19 -- with respect to the 30 days before, are you producing

20 all responsive documents?

21         MR. MORIARTY:  We are producing all responsive

22 documents to the extent that the defendants are obliged

23 to do so.

24         THE COURT:  And by defendants --

25         MR. MORIARTY:  We do that without objection,

1  Your Honor.

2        THE COURT:  And by defendants, you mean only

3  those specifically named defendants.

4        MR. MORIARTY:  That's what the -- yes.  Those

5  are the defendants in the case.  Those are the people to

6  whom the requests are directed.  Those are the people

7  over whom the Court has authority.  And those are the

8  people as to whom we will be responding.

9        THE COURT:  All right.  What about 30 days

10  after?  You obviously are going to object to the

11  mortality review.  What about other documents that were

12  created, emails that were created after the fact?

13        MR. MORIARTY:  As -- again, we plan -- our plan

14  is to respond, to the extent that these defendants have

15  the capability of responding.  And frankly, I haven't

16  framed the exact nature of the response and didn't

17  expect to have -- to be defining that right now.  But --

18        THE COURT:  Well, do you understand my

19  frustration as a court who is required to push discovery

20  to completion on a timely basis with being presented

21  with broad principles at a time when we need to get to

22  the nuts and bolts of discovery?

23        MR. MORIARTY:  I do, and that, Your Honor, with

24  respect, is exactly what I'm trying -- I've been trying

25  to do.  I apologize if I've not done it well.  I do

1   think we need to get to the nuts and bolts of the

2   discovery issues here and what I had perceived, as I

3   tried to convey through on my submissions, was that we

4   were getting a broad ranging, unfocused, untargeted

5   approach towards discovery from the plaintiffs and that

6   we needed court guidance on where we were going,

7   certainly before we started in on depositions.

8        Again, I apologize if the Court perceives it

9   differently, but what I perceived was a number of

10  messages from the plaintiffs.  We don't see ourselves as

11  bound at all, and in fact they conveyed we are doing

12  discovery to try to find evidence that other dismissed

13  defendants had notice, which is entirely separate from

14  the quality immunity issue and anything that's

15  appropriate on qualified immunity.  But they conveyed

16  that that's part of their purpose and what they intend

17  to pursue.

18        THE COURT:  And my problem, Mr. Moriarty, is

19  that general principle may be the case, but there's

20  going to be overlap between the two.  For example,

21  policies and procedures that are in place.  Your clients

22  may say one, they weren't aware of what those policies

23  and procedures were; two, those policies and procedures

24  were followed; three, those policies and procedures

25  don't apply.  But we need to know what the policies and

1  procedures were with respect to these defendants.

2        MR. MORIARTY:  I understand, Your Honor, and

3  I'm sorry.  Now I'm understanding where the confusion

4  lies.

5     I believe you're looking at the plaintiffs' first

6  set of discovery requests.  We responded fully to those

7  first set of discovery requests, providing all of those

8  policies and procedures.  Those have already been given

9  to them.  October 22nd.  Before the due date.  And that

10 was without objection.  We responded fully to the

11 plaintiffs' first set of discovery requests, including

12 those policies and procedures.  Even though there were

13 questions and requests in there that in our view went

14 beyond the proper scope of qualified immunity, we raised

15 no objections whatsoever.  We responded fully.

16    I don't know if that changes the way the Court is

17 looking at it, but that -- we're not -- we already --

18 there is no discovery that has been delayed by the

19 defendants at all.  We have been proceeding first off

20 with responding fully to the first set of discovery

21 requests.

22    Second.  We got -- we have now a second set of

23 discovery requests and two more that the Court isn't

24 even aware of.  We intend to respond on a timely basis

25 to each of those discovery requests.  We were asked to

1   set depositions, to arrange for depositions.  We made

2   those arrangements, and we went through a lot of effort,

3   came up with available dates, presented them to counsel,

4   and now we have depositions set.

5        We have problems with the messages that have been

6   sent and the potential scope and that's why we brought

7   it to the Court's attention before things exploded,

8   because I perceived explosions coming up during the

9   depositions themselves primarily, but we have complied

10  fully with discovery requests and haven't delayed

11  anything.

12          THE COURT:  Very good, Mr. Moriarty.  I'm

13  delighted to hear it.  Then your general motion with

14  respect to your roman numeral I for the Court to

15  prophylactically set the limit of scope of disclosure

16  and discovery to certain matters and prescribed

17  discovery methods will be denied.  The Court is

18  available on very short notice to address unreasonable

19  specific positions by either side.  I deny it not

20  because there are no limits to discovery, but because I

21  am not going to rule on a hypothetical.

22       If and when you get to specific problems, the Court

23  is readily available.  You should call my chambers.  I

24  will make myself available and we will quickly dispatch

25  any individual problems that may present themselves for

1   discovery.

2       Now, as to roman numeral II, which is a request to

3   address the location of depositions, when you said,

4   Mr. Moriarty, that you set -- you established dates for

5   the depositions, where were you proposing?  And I don't

6   mean generally, I mean very specifically where were you

7   proposing they take place?

8           MR. MORIARTY:  Thank you.  Our proposal is that

9   each deponent --

10          THE COURT:  Don't tell me where they're

11  located.  Tell me exactly where the depositions were

12  located.

13          MR. MORIARTY:  All right.  There is on file,

14  I'm trying to get to it, a document that has the

15  location.

16          THE COURT:  Well, let's take a specific

17  example.  With respect to Mr. Tobiasz.

18          MR. MORIARTY:  Yes.

19          THE COURT:  Where were you proposing his

20  deposition be taken?

21          MR. MORIARTY:  At Columbia Correctional

22  Institution at Portage, Wisconsin where he is working.

23  The reason --

24          THE COURT:  Hang on, Mr. Moriarty.  We're

25  almost there.  You've almost given me the answer we're

1 looking for.

2          MR. MORIARTY:  Waupun.  Waupun.  I'm sorry.

3          THE COURT:  Where at Waupun?  The Court is

4 familiar with that facility.

5          MR. MORIARTY:  It would be -- I don't know that

6 we have the exact room within Waupun, but it would be --

7          THE COURT:  Well, tell me between the lockdown

8 area and the area generally available, where would it be

9 located?

10          MR. MORIARTY:  As far as I'm aware right now,

11 Your Honor, and I have limited knowledge because I can't

12 say for sure, I haven't gotten that, but my

13 understanding from prior experience is is that it would

14 be a conference room outside of the locked -- excuse me.

15 Can I just check with that Nanette and she has some

16 knowledge of that.

17          THE COURT:  I would appreciate it.

18          MR. MORIARTY:  Thank you.  Nanette is going to

19 tell you what she recalls from prior times.

20          THE COURT:  Very good.

21          MS. SCHEEL:  As soon as you walk into the

22 facility, Your Honor, you walk up two flights of stairs

23 and the conference room is right on that level.

24          THE COURT:  So they're not going through any

25 security.

1    MS. SCHEEL:  No.  And that's typical for going

2 into a correctional institution, you don't --

3    THE COURT:  No, no.  Thank you very much for

4 your answer.  I know what's typical.  I just wanted an

5 answer.

6    MR. MORIARTY:  Thank you.

7    THE COURT:  Thank you.  Now with respect to the

8 plaintiff, I'll hear from you why -- well, actually I

9 guess, Mr. Moriarty, are you proposing that the

10 plaintiffs go hither and now to each of the institutions

11 to take these depositions?

12    MR. MORIARTY:  That is the proposal that we --

13    THE COURT:  Well, that's absurd and it's

14 offensive and it's not going to be required of the

15 plaintiff.  If you want to gather people in a central

16 location, that's reasonable.  But you know, there's got

17 to be some limit -- having qualified immunity doesn't

18 mean that you get to put the plaintiffs through every

19 hoop.  It doesn't change the basic nature of discovery

20 and it doesn't make your defendants subject to a special

21 set of discovery rules, which is what you're suggesting.

22    Now, I'm somewhat sympathetic to the notion they

23 have all to traipse down to Milwaukee for these

24 depositions because there is some reasonable position

25 that ought to be reached by the parties and I'm shocked

1  that I'm sitting here spending my day discussing

2  something that should have been resolved by the parties.

3      So I will turn to the defendants -- I'm sorry, to

4  the plaintiff and ask do you have some compromise

5  position?  Because your position of asking them all to

6  come to Milwaukee to be deposed is not something the

7  Court is prepared to answer, notwithstanding the fact

8  that it arguably is within the 100 miles that you're

9  entitled to insist upon in ordinary discovery.

10      MR. GENDE:  Thank you, Your Honor.  James Gende

11  on behalf of plaintiffs.  We have offered several

12  compromises to Mr. Moriarty's clients.

13      THE COURT:  So why don't you offer one now to

14  the Court so we can get moving.

15      MR. GENDE:  Okay.  I suggested that for any

16  high level officials we would go to Madison and handle

17  it at Mr. Moriarty's office.

18      THE COURT:  All right.  All depositions of the

19  defendants in this case will be handled in Madison at

20  the Attorney General's Office.  That's the Court's

21  order.

22      Now I believe then that addresses roman numeral II

23  of the general motion for protective order.  Anything

24  further, Mr. Moriarty, with respect to your general

25  motion that you believe the Court has not addressed?

1      MR. MORIARTY:  I believe the Court has

2   addressed what I have raised, yes.

3      THE COURT:  All right.  I will sanction the

4   defendants $100 for bringing this general motion without

5   focus to the specific disputes in this case.  There is

6   nothing unusual about these basic disputes.  There

7   should have been a compromise reached by the parties.

8   While I think the defendants may have been acting in

9   good faith, it was obstructionist and they should be

10  sanctioned, if for no other reason than I'm sending a

11  message to both sides that I do not expect this kind of

12  lack of cooperation to continue and both sides will be

13  subject to additional monetary sanctions if it

14  continues.

15      Now, as to the motion for protective order

16  regarding Michlowski's deposition, tell me exactly what

17  it is that you're asking the Court for, Mr. Moriarty.

18      MR. MORIARTY:  As to Dr. Michlowski, he is a

19  dismissed defendant, a nonparty, who was and remains at

20  Wisconsin Resource Center, a separate department from

21  the Department of Corrections.  He is not -- both the

22  notice and the subpoena convey that plaintiffs intend to

23  pursue a lot of information that has -- and I appreciate

24  the Court's order and I'm not going to belabor that, but

25  when you are seeking to depose a doctor at a separate

1   institution run by a separate department and require him

2   to produce all policies and procedures related to

3   inmates at risk of suicide at the WRC at any time, going

4   way back in time, any documents including emails

5   exchanged between yourself and any other person besides

6   an attorney as it relates to Jessie Miller at any time,

7   and Jessie Miller was at WRC for quite a long time, well

8   over a year, it appeared to us that this deposition was

9   far beyond appropriate limits in this qualified immunity

10  setting.

11          THE COURT:  All right.  Mr. Gende, why do you

12  need this deposition at this time?  And why would it

13  encompass all procedures at a facility that was not the

14  location of the suicide?

15          MR. GENDE:  Thank you, Your Honor.  We withdrew

16  that request on all policies and procedures in an

17  attempt to compromise the discovery disputes that

18  Mr. Moriarty had raised.  We substantially reduced our

19  requested emails regarding Jessie Miller, and I believe

20  it's in an email that may be before the Court.  I think

21  we wanted emails, again, 30 days before and his attempts

22  to communicate -- I'm sorry, Michlowski's attempts to

23  communicate his understanding of Jessie Miller's serious

24  medical condition, suicidal tendencies and self-harming

25  behavior.  He indicated in chart notes before transfer

1   that Jessie Miller should be watched.  We'd like to talk

2   to him about who he spoke with at the facility.

3   Apparently there were some phone calls made between WRC

4   and CCI staff.

5           THE COURT:  All right.  Mr. Moriarty.  Sounds

6   extremely reasonable to me.  What about to you?

7           MR. MORIARTY:  All right.  If it is limited to

8   communications between Dr. Michlowski and people at

9   CCI --

10           THE COURT:  No, no.  That's not how this is

11   going to happen.

12           MR. MORIARTY:  All right.

13           THE COURT:  If you want to insert an

14   objection --

15           MR. MORIARTY:  Um-hmm.

16           THE COURT:  -- during the deposition because

17   something has gone beyond the scope of discovery, you

18   may do so and you will suffer the consequence if you are

19   viewed by this court to be obstructionist.  But I've

20   just been told that they offered to narrow their

21   discussion, and it seems eminently reasonable to me.

22   It's been represented to me that they did so in writing,

23   and I am having trouble understanding why we are not

24   proceeding with discovery at this point.

25           MR. MORIARTY:  Understood, Your Honor.

1          THE COURT:  All right.  This motion is also --

2          MR. MORIARTY:  Your Honor, might I --

3          THE COURT:  No, you may not.  This motion is

4    also denied and the deposition of Dr. Michlowski will go

5    forward subject to the general rules of discovery as to

6    relevance.

7          Now Mr. Moriarty, you're free to draw the line

8    where you think it applies as to good faith, but you do

9    so with an obligation as a court officer not to obstruct

10   reasonable discovery and a basis for objection is not

11   that this might lead to liability for others.  It's that

12   it doesn't relate to the potential lack of good faith;

13   i.e., deliberate indifference from or by the defendants

14   in this case.

15         Now Mr. Moriarty, do you have anything further for

16   the Court today?

17         MR. MORIARTY:  No, Your Honor.  Thank you.

18         THE COURT:  Mr. Gende, please don't

19   misunderstand the Court's rulings today.  While I have

20   been hard on Mr. Moriarty because I am being asked to

21   rule on hypotheticals and draw lines that cannot be

22   drawn because they implicitly involve gray areas, I am

23   not giving the plaintiffs *carte blanch* to ask anything

24   and everything they may think of, and certainly not to

25   get into damages questions or to go beyond the scope of

1    what these defendants knew or should have known, whether

2    it was with respect to policies or procedures or with

3    respect to the circumstances surrounding the suicide

4    that is the subject of this matter.

5         Are we clear?

6              MR. GENDE:  Crystal.

7              THE COURT:  Very good.  Then I thank you all

8    and I anticipate cooperation by both sides going

9    forward.  But I am available on short notice should

10   someone deem it necessary to involve the Court further.

11   Thank you all.

12              MR. MORIARTY:  Thank you, Your Honor.

13         (Proceedings ended at 9:33 a.m.)

14

15                        *  *  *  *  *

16         I, LYNETTE SWENSON, Certified Realtime and Merit
     Reporter in and for the State of Wisconsin, certify that
17   the foregoing is a true and accurate record of the
     proceedings held on the 21st day of November 2012 before
18   the Honorable William M. Conley, Chief Judge for the
     Western District of Wisconsin, in my presence and
19   reduced to writing in accordance with my stenographic
     notes made at said time and place.
20   Dated this 26th day of November 2012.

21

22

23                   /s/_____

24                   Lynette Swenson, RMR, CRR, CBC
                          Federal Court Reporter

25